Jack COOPER, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 94–490L.

United States Court of Federal Claims.

Nov. 22, 1996.

---

Jim Waide, Tupelo, MS, for plaintiff. David Chandler, of counsel.

Stuart B. Schoenburg, Washington, DC, with whom was Assistant Attorney General Lois J. Schiffer, for defendant. Calon Blackburn, Jr., Army Corps of Engineers, Mobile, AL, of counsel.

## OPINION

MILLER, Judge.

This matter is before the court on defendant's motion for judgment on partial findings pursuant to RCFC 52(c), made at the close of plaintiff's case, arguing that plaintiff had failed to prove that the Government caused the flooding of his property. The court orally granted defendant's motion and advised the parties that it would file findings of fact and conclusions of law as required by Rule 52(c).

## FACTS

The Tennessee–Tombigbee Waterway (the "Tenn–Tom") is an impressive Army Corps of Engineers (the "Corps") navigation project that connects the Tennessee River in northeast Mississippi with the Tombigbee River in Demopolis, Alabama. From Demopolis the waterway continues south as the Tombigbee, joining the Alabama River to form the Mobile River, which eventually flows into the Gulf of Mexico at Mobile, Alabama. First opened to commercial traffic in December 1985, the Tenn–Tom serves as part of a navigation system that allows boats and barges to travel uninterrupted from the midwestern United States to the Gulf of Mexico.

The section of the Tenn–Tom involved in this case is known as the canal section. The canal section begins just south of Tishomingo, Mississippi, and flows in a southerly direction to a point just south of Amory, Mississippi. In order to enable boats and barges to navigate between pools of substantially different elevations, the canal section contains six locks that can raise and lower waterway traffic between the different pools. The six locks located on the canal section are,

from south to north, Locks A, B, C, D, and E, and the Bay Springs Lock. Lock E, which is the only canal section lock relevant to the case at bar, raises and lowers waterway traffic a total of 18 feet. The water north of Lock E is referred to as Pool E, and the water south of Lock E is referred to as Pool D.

When constructing the Tenn–Tom, the Corps built an artificial levee along the western edge of the canal section of the waterway. Due to the levee, streams and tributaries that once crossed what is now the waterway are disrupted. Water can enter the Tenn–Tom on its eastern shore, but the levee prevents the water from following its natural course on the western side of the waterway. To remedy this problem, the Corps constructed minimum flow structures that allow water from the Tenn–Tom to flow at a pre-determined rate under the levee and into the stream beds in which water flowed prior to the construction of the waterway.[1] Of importance to the instant case are two minimum flow structures, known as the Mackeys Creek minimum flow structure and the Red Bud Creek minimum flow structure. These structures allow water to pass into Mackeys Creek and Red Bud Creek at the points where the Tenn–Tom bisects each creek on the west. The Mackeys Creek minimum flow structure is located approximately 3.6 miles upstream of Lock E, and the Red Bud Creek minimum flow structure is located approximately 2.8 miles upstream of Lock E. The former releases water into Mackeys Creek directly; the latter releases water into Red Bud Creek, which joins Mackeys Creek. The water released from the minimum flow structures enters Mackeys Creek at a fixed rate; the Red Bud Creek minimum flow structure releases water at the rate of 20 cubic feet per second ("cfs"), and the Mackeys Creek minimum flow structure releases water at the rate of 50 cfs. Cumulatively, these two devices permit 70 cfs of water to flow from the

---

1. The minimum flow structures resemble common box culverts that are often found under a street or highway. Each minimum flow structure contains a drop inlet on the east side of the levee. The drop inlet connects to a stilling basin, located on the west side of the levee.

west side of the Tenn–Tom into Mackeys Creek.[2]

Mackeys Creek follows a twisting and turning southern course on the west side of the waterway. Approximately seven miles below Lock E, Mackeys Creek converges with the confluence of the Little Brown and Big Brown Creeks to form the East Fork of the Tombigbee River (the "East Fork"). Pursuant to an agreement with the Department of the Army and the Tennessee Valley Authority, the Northeast Mississippi Regional Water Supply District (the "Water Supply District") is permitted to withdraw 30 million gallons of water per day from the East Fork for municipal and industrial supply purposes. The Water Supply District removes water from the East Fork at Fulton, which is located approximately 28 miles downstream from Lock E. Although the removal of water from the East Fork provides great benefits to the residents of Tupelo, it threatens to deprive the East Fork of a sufficient flow of water. Without sufficient water both the aquatic habitat and riparian rights could suffer harm. To prevent such adverse consequences, the Corps constructed a spillway adjacent to Lock E.[3] The purpose of the spillway is to supplement the water entering Mackeys Creek from the minimum flow structures. When the depth of the East Fork at Fulton approaches 6.8 feet, one or more of the spillway gates is opened, and

water previously impounded in Pool E of the waterway flows through the spillway into Mackeys Creek.[4]

Jack Cooper ("plaintiff") owns approximately 467 acres of land in Itawamba County, Mississippi. Of this total acreage, plaintiff claims that 270 acres have been flooded because the Corps released water into Mackeys Creek, which flowed into the East Fork. The 270 acres are located approximately halfway between the Lock E spillway and the Fulton U.S. Geological Survey Gaging Station (the "Fulton Gage") on the East Fork. The 270 acres are bordered on the east by the East Fork, on the west by the Donivan Creek Channel, on the north by the Guin and Houston farms, and on the south by the intersection of Donivan Creek and the East Fork. Water flows within plaintiff's property through two drainage ditches, known respectively as Donivan Creek Slough and Hogpen Slough.[5] Donivan Creek Slough runs from the Guin property south onto the western side of the Cooper property. The slough then turns east, flowing diagonally across the Cooper property until it intersects with the East Fork. Hogpen Slough runs from the Ivy property south through the Houston property and along the east side of the Cooper property, eventually connecting with the East Fork.

---

2. The Mackeys Creek and Red Bud Creek minimum flow structures have provided a continuous discharge since 1987.

3. The spillway consists of five gates, each gate 45 feet wide and 13 feet high. Electric hoists placed on piers between the gates allow operators to raise and lower the gates as desired.

4. The extent to which the Corps operators at Lock E open one or more of the spillway gates depends on how low the water level is at Fulton. The more water that is needed to maintain a river depth of 6.8 feet, the more the spillway gate(s) is opened.

5. The Hogpen Slough is also known as the Unnamed Creek.

GENERAL SITE MAP

SOURCE USGS TOPOGRAPHIC MAP KIRKVILLE MS

Cooper Property - Shaded

On September 30, 1996, the parties and the court participated in a day-long inspection of 20 sites designated by both plaintiff and defendant. The site inspection included the Fulton Gage, the levee, Lock E, the Lock E spillway, and the minimum flow structures, in addition to a boat trip along the portion of the East Fork that borders the Cooper property and courses one-half mile north through the Houston property. During the inspection, the court took notice of several features that are highly relevant to the issues in dispute. First, while touring the Lock E control center, the Lock E manager called the Fulton Gage. At approximately 12:00 p.m. on September 30, 1996, the depth of the

East Fork at Fulton was 8.2 feet.[6] Second, except for a brief demonstration for the benefit of the court, the Lock E spillway was not releasing water during the site inspection. Third, the banks of the East Fork adjacent to the Cooper property were not well formed. Rather, the banks of the East Fork consisted of slightly sloping clayey dirt formations. The court observed several small crevices where the river appeared to be moving west along the bank of the East Fork.

Plaintiff's complaint alleges that in 1991 the Corps flooded his land when it released water from the Tenn–Tom into the East Fork.[7] According to plaintiff, the Corps re-

6. The court did not take testimony on this site inspection. However, because Mr. Cooper testified that he relied on this reading for the purpose of changing his theory of liability, the court considers it. Transcript of Proceedings, *Cooper v. United States*, No. 94–490L, at 137, 189–91 (Fed.

Cl. Oct. 9, 1996); *see also infra* notes 11 & 12 and pp. 37–38.

7. Plaintiff filed an earlier complaint alleging that the United States had taken by inverse condem-

leased the water in order to fulfill an agreement with the City of Tupelo.[8] By flooding his property, plaintiff claims that the Government has taken an involuntary flood easement and now must compensate him as mandated by the Fifth Amendment of the United States Constitution.

Defendant moved for summary judgment, arguing that plaintiff could not prove that the Corps caused the flooding of plaintiff's property and that no material facts therefore remained in dispute. According to defendant, the flooding of plaintiff's property was caused by beaver dams that prevented water, entering plaintiff's property from sources other than the East Fork, from draining into the river. The propriety of summary judgment was extensively briefed by both parties, and the court ultimately denied defendant's motion. During the course of briefing, however, the court allowed both plaintiff and defendant to submit sur-replies. In his sur-reply plaintiff expanded his theory of entitlement to compensation, alleging for the first time that water was entering Mackeys Creek from a point other than the Lock E spillway: "I personally observed a large volume of clear water flowing out of Pool E into Mackey[s] Creek. The water flows through a concrete structure. It does not pass through Lock E." Affidavit of Jack Cooper, May 9, 1996, ¶ 14. As plaintiff's trial testimony later made more clear, the concrete structure referred to in his May 9, 1996 affidavit was the Mackeys Creek minimum flow structure.

On the first day of the trial, plaintiff again expanded his theory of causation. According to plaintiff, the Corps release of water from the Tenn–Tom was not the sole cause of the flood. Rather, excess sediment on the bed of the East Fork adjacent to plaintiff's property in combination with the release, caused the East Fork to leave its banks.[9]

Plaintiff called three witnesses for his case in chief—plaintiff himself; Terry Guin; and Dr. Philip E. LaMoreaux, Sr., defendant's expert, who testified as an adverse witness. Plaintiff, a 72–year–old gentleman, first became involved with the property in question in 1948. In 1982 he received title to the property from his uncle S.K. Cooper, subject to the latter's life estate. From 1948 to the present, plaintiff has used the land for a variety of purposes: growing corn and hay, raising cattle and chickens, renting the land to share-croppers, and harvesting timber. Terry Guin farms two tracts of land immediately north of the Cooper property, one of which is the Guin farm and the other, the Houston property. Mr. Guin is familiar with the Cooper property, having fished and hunted for coon on the property since childhood. Dr. LaMoreaux is a senior hydrologist for P.E. LaMoreaux & Associates, a consulting firm hired by defendant to assist in preparing its defense. Dr. LaMoreaux is also familiar with the Tenn–Tom because he served on an environmental advisory board during construction of the waterway.

Plaintiff's property is a low-lying tract in the flood plain of the East Fork. During spring 1991 northeast Mississippi experienced historic amounts of rain. In May 1991, for example, climatological data compiled by the National Oceanic and Atmospheric Administration indicate that Fulton, Mississippi, received over 20 inches of precip-

---

nation 70 acres of his property when debris from the Tenn–Tom construction project floated down Mackeys Creek and impeded drainage on plaintiff's property. The Federal Circuit ruled in plaintiff's favor in *Cooper v. United States,* 827 F.2d 762 (Fed.Cir.1987). In the case at bar, plaintiff does not seek compensation for the 70 acres which were the subject of his prior lawsuit.

**8.** A review of documents submitted by plaintiff indicates that the contract was between the United States and the Water Supply District.

**9.** Defendant objected to plaintiff's theory that sedimentation, in combination with water released from the Tenn–Tom, caused plaintiff's property to flood. According to defendant,

plaintiff heretofore had never raised sedimentation as a possible cause of flooding, so that defendant was not on notice of the need to defend against such a claim. Throughout the two days during which plaintiff put on his case, plaintiff repeatedly pointed to evidence that he believed demonstrated that defendant was in fact on notice of plaintiff's sedimentation theory. The court does not find it necessary to rule on defendant's objection to plaintiff's sedimentation theory. Even considering the evidence introduced by plaintiff to prove that sedimentation contributed to the flooding, the evidence yields the same result, namely that plaintiff did not show a right to relief.

itation. Both parties agree that, prior to 1991, the East Fork would overflow onto plaintiff's property after heavy rains.

In 1990 plaintiff began efforts to build a catfish pond on the southeast corner of his property. As a first step towards this end, plaintiff cleared approximately 14 acres of land. In early July 1991 plaintiff discovered that water was running from Donivan Creek Slough into the field which was to contain the catfish pond (the "catfish pond field"). After some investigation, plaintiff determined that excess sediment on the bed of the East Fork was causing water to flow onto his property. With the help of his neighbor, Mr. Guin, plaintiff detonated a case of dynamite in the bed of the East Fork on July 5, 1991, approximately 100 yards below where Donivan Creek Slough intersects the East Fork. Because the July 5 detonation did not resolve completely the sediment problem, plaintiff detonated a second case of dynamite on July 6. On this occasion the dynamite cleared the excess sediment, thereby allowing the flood water to run off plaintiff's field and back into the East Fork.

Having remedied the sedimentation problem as it existed on July 5, plaintiff, during the last week of July, began building a dirt levee on the north side of the catfish pond field. Plaintiff intended to use the levee as a retaining wall for the catfish pond. The levee was approximately 100 feet wide and eight to ten feet high. On July 25 during construction, plaintiff uncovered an old slough with his bulldozer. Because the uncovered slough made conditions too wet to continue working, plaintiff left his bulldozer, back hoe, and truck in the field. Plaintiff returned to the field around noon on July 27, expecting to continue his work on the levee. However, he found the field flooded with water. To determine the source of the water, plaintiff followed Donivan Creek Slough to the point where it meets the East Fork. There, plaintiff witnessed water running from the East Fork into Donivan Creek Slough. According to plaintiff, water entered his property on July 27, and water was coming onto his property from the East Fork until October 1, 1995.

Seeking an answer as to why his property flooded, plaintiff telephoned Ricky Saucer, Chief of the Navigation Branch of the Tennessee–Tombigbee Project Management Office, sometime between August 10 and 15, 1991. Mr. Saucer sent Dale White, a Corps construction inspector, to examine plaintiff's property on September 10, 1991. Plaintiff testified that he told Mr. White that Ricky Saucer had stated to plaintiff that the Corps had to keep the Fulton Gage at a minimum of 6.8 feet. Plaintiff wanted to establish as a party admission, pursuant to Fed.R.Evid. 801(d)(2), that Mr. White responded, "well I don't believe it'll ever be no better." The court ruled that the quoted language was not probative of anything and struck it.

To support his theory that the Corps release of water caused the flooding of his property, plaintiff offered evidence concerning releases of water from the Lock E spillway. On July 26, 1991, gate 1 of the spillway was open .25 feet from 4:45 p.m. until 6:30 p.m. During the time that the spillway was open, 11.8 million gallons of water were released from the spillway and the minimum flow structures into Mackeys Creek. On July 27, one day after the spillway was opened, the depth of the East Fork at the Fulton Gage was 7.31 feet. Dr. LaMoreaux testified that the river depth at Fulton Gage on a given date would provide a "very good" indication of the river depth adjacent to plaintiff's property on that same date.

All witnesses testified about the presence of beaver dams on the Cooper property. According to Dr. LaMoreaux, the beaver dams built in crevices along the East Fork prevented water entering plaintiff's property, from the north and west, from running into the river and thus caused plaintiff's property to flood. Plaintiff, while conceding that there are beaver dams currently on his property, explained that these beaver dams did not exist in 1991. Prior to 1991 plaintiff regularly used his backhoe to remove beaver dams that were blocking drainage ditches along the banks of the East Fork. After the July 1991 flood, however, plaintiff stopped destroying the beaver dams. He believed that such an effort was futile while there was water on the property.

## DISCUSSION

### I. *Dismissal pursuant to RCFC 52(c)*

RCFC 52(c) provides:

If during a trial a party has been fully heard with respect to an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party on any claim, counterclaim, cross-claim or third-party claim that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence.

In the Court of Federal Claims, the judge serves as both the trier of fact and the trier of law. Accordingly, RCFC 52(c) envisions a different role for the judge than does Fed.R.Civ.P. 50(a). *See Persyn v. United States*, 34 Fed.Cl. 187, 194–95 (1995). A judge ruling on a Rule 52(c) motion does not evaluate merely whether the plaintiff has put forth a *prima facie* case. Instead, RCFC 52(c) permits the judge to weigh the evidence and does not require that the judge resolve all credibility determinations in favor of the plaintiff. *Howard Indus., Inc. v. United States*, 126 Ct.Cl. 283, 289–90, 115 F.Supp. 481, 484–85 (1953); *Cities Serv. Pipe Line Co. v. United States*, 4 Cl.Ct. 207, 208 (1983) (discussing former RUSCC 41(b)), *aff'd*, 742 F.2d 626 (Fed.Cir.1984). As the United States Court of Claims explained:

The so-called *prima facie* case rule governing the action of judges in jury trials rests upon the established division of functions, in such proceedings, between jury and judge, whereby the jury tries the facts and the judge determines the law....

But in an action tried without a jury the judge is the trier of both the facts and the law. This fundamental distinction between jury and non-jury trials should not be ignored.... When a court sitting without a jury has heard all of the plaintiff's evidence, it is appropriate that the court shall then determine whether or not the plaintiff has convincingly shown a right to relief. It is not reasonable to require a judge, on motion to dismiss under Rule 41(b) [precursor to RCFC 52(c)], to determine merely whether there is a *prima facie case* ... sufficient for the consideration of a trier of the facts *when he is himself the trier of the facts.* * * * A plaintiff who has had full opportunity to put on his own case and has failed to convince the judge, as trier of the facts, of a right to relief, has no legal right under the due process clause of the Constitution, to hear the defendant's case, or to compel the court to hear it, merely because the plaintiff's case is a *prima facie* one in the jury trial sense of the term.

*Howard Indus.*, 126 Ct.Cl. at 289–90, 115 F.Supp. at 485–86 (quoting *United States v. United States Gypsum Co.*, 67 F.Supp. 397, 417–18 (D.D.C.1946), *rev'd on other grounds*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).

The court carefully examined the record in this case, as required by Rule 52(c). This examination revealed snippets of evidence that support plaintiff's theories of liability. However, the pieces of evidence supporting plaintiff's case are fragmented; taken together they do not prove any one theory of causation. Although plaintiff was anxious to have defendant proceed with its case, the Court of Claims in *Howard Indus.* instructed that the time for a plaintiff to prove its case is during the plaintiff's case in chief. A plaintiff has no automatic right to cross-examine a defendant's witnesses for the purpose of proving what the plaintiff failed to establish during the presentation of its case.

### II. *Taking without just compensation*

The Fifth Amendment of the United States Constitution provides, in part, that private property shall not "be taken for public use without just compensation." As the Supreme Court has explained: "Property is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in course of time." *United States v. Dickinson*, 331 U.S. 745, 748, 67 S.Ct. 1382, 1384, 91 L.Ed. 1789 (1947) (*quoted in Turner v. United States*, 901 F.2d 1093, 1095 (Fed. Cir.1990)). Where the Government subjects

a claimant's land to flooding, the Government may be deemed to have taken a flowage easement over the affected land. In order to establish that the Government has taken an easement by flooding, a plaintiff must prove by a preponderance of the evidence that 1) the flooding was intermittent, frequent, and inevitably recurring; 2) the flooding was the natural and probable consequence of government action; and 3) the flooding resulted in substantial damage to the plaintiff's property. *Barnes v. United States*, 210 Ct.Cl. 467, 474–76, 538 F.2d 865, 870–71 (1976); *Fromme v. United States*, 188 Ct.Cl. 1112, 1118, 412 F.2d 1192, 1196 (1969).

Plaintiff offered two different theories of causation during the pendency of this case.[10] In his opposition to defendant's motion for summary judgment, plaintiff argued that releases of water from the Lock E spillway and the minimum flow structures caused his property to flood: "The plaintiff contends that water the Defendant dumped into Mackey[s] Creek caused the flooding of his property." Plf's Br. filed Mar. 22, 1996, at 5. At the outset of trial, plaintiff's counsel offered a second and different theory of causation, namely that excess sediment in the East Fork, together with the Corps releases of water into Mackeys Creek, caused the flooding of plaintiff's property:

> That's our case. The combination of the water from minimum-flow structures and the sedimentation. Your Honor, the reason we think the sedimentation is such a part of it—I can't quite remember all of these figures, but I believe the evidence is going to show that when it was flooded—when the man from the Corps of Engineers went in there with Jack in September and saw it flooded—the gauge at Fulton was lower than it is now when it was not flooded. So that's why we say that it's the sedimentation in conjunction with the water. The water in itself standing alone, if it weren't for the fact that they've had all

the sediment come in there, it wouldn't be flooding it.

In order to ensure fair consideration of all of the theories that plaintiff advanced, the court will analyze both of plaintiff's causation theories in turn.

### 1. *Release of water from Tenn–Tom as cause*

■ Both plaintiff and Mr. Guin testified that plaintiff's property flooded sometime between July 25 and July 27, 1991. Plaintiff was constructing a levee on the north side of the catfish pond field when his bulldozer uncovered an old slough. Deciding that the field needed to dry for a day or two, plaintiff left his bulldozer, backhoe, and truck in the field. When plaintiff returned to the field on July 27, he found the field flooded. Mr. Guin's testimony comports with that of plaintiff. He, too, recalls that the field in question was flooded from the East Fork during the last week of July. Mr. Guin remembers that the water in the field was anywhere from ankle to knee-deep. Based on the testimony of plaintiff and Mr. Guin, the court finds that water entered plaintiff's field sometime between July 25 and July 27.

■ Proof of damage alone, however, does not establish a taking. *Loesch v. United States*, 227 Ct.Cl. 34, 44, 645 F.2d 905, 914 (1981). Plaintiff must also prove that government action was the natural and probable cause of the flood. At trial plaintiff introduced into evidence the "Record of Gate Openings at Lock and Dam E on Tenn–Tom Waterway" for July 23 through July 29, 1991. This Corps document indicates that gate 1 of the Lock E Spillway was open .25 feet from 4:45 p.m. until 6:30 p.m. on July 26, 1991. Plaintiff asked Dr. LaMoreaux how much water the Lock E Spillway, together with the minimum flow structures, released into Mackeys Creek while gate 1 was open. Although Dr. LaMoreaux did not know the

---

10. One could conclude that plaintiff has put forth three different causation theories: 1) that releases from the Lock E spillway caused the flood; 2) that releases from the Lock E spillway and the minimum flow structures caused the flood; and 3) that increased sediment in the East Fork, in conjunction with releases from the Lock E spill-

way and the minimum flow structures, caused the flood. Upon examination, plaintiff's Lock E spillway theory is subsumed within plaintiff's Lock E spillway and minimum flow structure theory and therefore does not require separate analysis.

answer to this question, the parties stipulated, after performing some calculations, that a total of 11.8 million gallons of water entered Mackeys Creek from the Lock E spillway and the minimum flow structures.

Corps records thus demonstrate that the Corps released 11.8 million gallons of water into Mackeys Creek on July 26, 1991. In order to prove that this release was the cause of the flood, plaintiff's counsel asked Dr. LaMoreaux whether the river could have flooded if the Corps had not released the water:

Q I'm referring, sir, to all the water the government was putting in as of July 1991. If the government were not putting any water in in July 1991, given the fact that we were just barely over 6.8 feet at Fulton in July '91—if the government wasn't putting any water in, there's no way in the world the Cooper property would have flooded down there in July '91, is there?

A It would have been low flow.

Q The answer is there was no way the Cooper property would have flooded, isn't that true, sir?

A That's correct.

On cross-examination defense counsel asked Dr. LaMoreaux whether, in response to the above questions from plaintiff's counsel, the witness had intended to say that water from the East Fork flowed onto the Cooper property on July 27, 1991:

Q Was it your opinion that any water from the East Fork flowed onto the Cooper property on July 27, 1991, from the data that you were able to analyze?

A No, I don't believe that water moved from the East Fork onto the Cooper property on that date. There were other causative factors.

11.· Although the court learned of the 8.2–foot river depth during the September 30, 1996 site inspection, plaintiff confirmed this measurement at trial, thus making it an official part of the record:

Q [by defense counsel] Mr. Cooper, you were out on the site visit yesterday?
A Yes.

Q Would you explain why there wasn't any water from the East Fork onto the Cooper property on that date?

A Well, because the rainfall that occurred up in the tributary basins for the unnamed tributary and Donivan Creek and also in the upstream area of the basin of Brown Creek were also contributing water down to the East Fork. So there were multiple sources. The low augmentation wasn't the cause for the flooding.

The Court: I'm confused, sir. You said that it was your opinion that you didn't believe that water moved from the East Fork onto the Cooper property on the date, which was July 27, 1991, and then I thought that your explanation which Mr. Schoenburg sought was that the rainfall in the tributary basins contributed to water in the East Fork.

. . . .

The Court: So it's your opinion it's not coming in from the East Fork on the banks of the property, as they adjoin the East Fork.

The Witness: No, sir, I do not believe that. And certainly it is not coming from the low flow augmentation.

Based on both the expert's contradictory statements and his confused demeanor while he was making the earlier statement, the court finds Dr. LaMoreaux's testimony on the subject of causation inconclusive. The witness' confused testimony therefore does not corroborate plaintiff's theories.

Other evidence introduced at trial gives rise to a strong inference that the water released from the spillway was not the sole cause of the flood. On July 27, 1991, the date plaintiff's property was flooded, the Fulton Gage recorded that the East Fork was 7.3 feet deep. On September 30, 1996, the date of the court's site inspection, the Fulton Gage recorded a river depth of 8.2 feet.[11]

Q And at that time, you were present when a call was put into the Fulton gauge to find out the level there?
A Yes, sir.
Q And it was 8.2?
A Yes, sir.
The court normally would not consider this testimony as evidence of what the site inspection revealed because it was elicited on cross-examination. However, defense counsel had ques-

During the boat trip along the portion of the East Fork adjacent to plaintiff's property in connection with the site inspection on September 30, 1996, the court noted that the water in the East Fork was below its banks and was not in any danger of flooding.[12] Given that the East Fork was nearly one foot lower on July 27, 1991, the day after the Corps opened the Lock E spillway, than it was on September 30, 1996, a day when the Lock E spillway was not open at all, the court must infer that the Corps release of water, by itself, did not cause plaintiff's property to flood. Without some alternative explanation, it is difficult to understand why a river depth of 7.3 feet would cause the East Fork to exceed its banks when a river depth of 8.2 feet did not cause a similar result. In fact, plaintiff himself felt compelled to offer his sedimentation theory in order to rebut the obvious inference. See discussion infra p. 39 & supra n. 6.

The comparison of river depths is not the only reason why the court finds that the opening of the Lock E spillway did not cause plaintiff's property to flood. Plaintiff also failed to establish a sufficient nexus between the release of 11.8 million gallons of water into Mackeys Creek and the flooding of plaintiff's property. Plaintiff did not offer testimony or other evidence as to how 11.8 million gallons of water would affect the flow of the East Fork on July 26–27, 1991. Plaintiff's property is located more than seven miles downstream from the Lock E spillway, and July 1991 was one of the driest months of the decade. Plaintiff did not explain how 11.8 million gallons of water, introduced into the East Fork at the end of a historically dry month, would alter the depth of the river

more than seven miles down stream of the point of release.

Plaintiff asks the court to infer that the flooding could not have occurred but for defendant's release of water during this particularly dry month. Employing this inference does not further plaintiff's case. If July 1991 was a particularly dry month, a fact that the court accepts, the East Fork would be at or near low flow toward the end of the month.[13] A low flowing river would have more capacity to hold incoming water, and therefore defendant's release of water on July 26 would have been less likely to cause the river to exceed its banks.

Additionally, the inference that plaintiff would have the court draw is questionable as it ignores the possibility that the flooding resulted from natural precipitation. Precipitation patterns in northeast Mississippi during 1991 were extremely varied. Although July 1991 was a very dry month, northeast Mississippi experienced substantial rainfall from February through May 1991. For example, Fulton recorded 12.42 inches of rain in February, 14.4 inches in April, and 21.35 inches in May 1991. By proposing this inference, plaintiff does not fully address the effect of this natural precipitation. Plaintiff focuses only on the dry conditions in July 1991. However, given the heavy amount of rain during the first half of 1991, the fact that July was a dry month does not establish that precipitation had no role in the flooding of the Cooper property. Thus, its proposed inference is based on incomplete data, and, when carried to its logical extreme, renders a conclusion that does not support its theory of liability.[14]

tioned plaintiff about a statement in his March 11, 1996 affidavit that the Corps had manipulated water levels. After plaintiff recanted the statement, defense counsel queried why, and plaintiff volunteered the information about the gage. See discussion infra p. 39. Because the gage reading was the basis for plaintiff's sedimentation theory, as plaintiff's counsel also previewed in his opening statement, plaintiff apparently accepted the gage reading as accurate.

12. Plaintiff confirmed on the record events the court observed during the September 30, 1996 site inspection:

Q [by defense counsel] Okay. So at 8.2, you observed your property and the property was not flooding, was it?
A That's right.

13. The Corps release of water from the Lock E spillway demonstrates that the East Fork was at or near low flow on July 26.

14. In fact, plaintiff could have argued that the large amount of rain caused the Corps releases to flood his property more readily than the same releases would in drier conditions. Yet, if plaintiff intended to make such an argument, he never connected the increased rain fall with the 11.8 million gallons of water released by the Corps.

### 2. *Release, in combination with sediment, as cause*

■ Recognizing that the release of water alone did not cause his property to flood, plaintiff testified that sediment on the bed of the East Fork, in combination with the spillway and minimum flow structure releases, was responsible for the July 1991 flood.

Q [by defense counsel] Mr. Cooper, I do have a problem here and let me just state it very succinctly.

A Okay.

Q You were present on the trip yesterday, you observed the Fulton—or you heard the Fulton gage read 8.2, is that correct?

A Yes, sir.

Q We are going to present evidence that shows that the Fulton gage on July 27, 1991 was lower than 8.2.

A Yes, sir.

Q But yet you're now testifying that when it was 8.2 it was not flooding and not at flood stage, but you're saying when it's lower than 8.2 it was at flood stage. Can you help me out on this, sir?

A Well, really and truly we didn't know exactly where the water came from and didn't know exactly what happened until yesterday and now we know sedimentation had the river filled up.

This theory, if proved, has the appeal of explaining why the river flooded at a depth of 7.3 feet on July 27, 1991, even though it did not flood at a depth of 8.2 feet on September 30, 1996.

Plaintiff's sedimentation theory is riddled with holes and displays noticeable credibility problems. Plaintiff did not prove how much sediment was on the bed of the East Fork at the end of July 1991, how the sediment would have altered the flow of the East Fork, or why the sediment is no longer on the river bed. If the court is to accept plaintiff's claim that sediment played a role in the flood, the court must first find that excess sediment was present on the riverbed on the date in

question and that the presence of excess sediment could cause the East Fork to exceed its banks.[15] While a precise measurement may not have been possible, plaintiff did not even offer a satisfactory approximation. At one point in his testimony, plaintiff suggested that the East Fork contained two feet more of sediment in July 1991 than it does at present.

Q [by defense counsel] . . . and you are saying there was flooding before and it was by sediment; so it was not caused by the water releases, is that correct?

A It was caused by the water releases. If it hadn't have been for the water releases that much water wouldn't have been in there.

Q There wasn't much water in there if it was less tha[n] 8.2 feet at Fulton, was there?

A It was nine-tenths of an inch less, but there must have been two feet more of sedimentation in there.

However, after the court asked plaintiff to confirm this estimate, plaintiff withdrew his initial representation:

The Court: So your testimony is there must have been two feet more of sedimentation in 1991 than what we observed yesterday?

The Witness: Well that was just something I threw in there. I shouldn't have said that.

The Court: Okay. But you are saying that there was more sedimentation in 1991?

The Witness: There was more sedimentation and it caused—

The Court: But there was more sedimentation—I don't want to put words in your mouth. Are you making the statement there was more sedimentation there when we were observing yesterday than in 1991?

The Witness: There was more sedimentation in 1991 than they [sic] were yesterday.

---

**15.** On the first day of trial, the court explained to the parties the facts it deemed necessary to rule on plaintiff's sedimentation theory: "All we need to know is what that river bed was in relation-ship to the releases to see if the releases caused the flooding given the condition of the river bed."

Plaintiff did offer some evidence that excess sediment was present on the bed of the East Fork on July 5, 1991. This testimony, however, did not assist plaintiff's case. Both plaintiff and Mr. Guin testified that sediment in the East Fork caused water to flood the catfish pond field on July 5. In order to stop the flooding, plaintiff and Mr. Guin detonated a case of dynamite in the bed of the river on July 5. They placed the dynamite approximately 100 yards below the intersection of Donivan Creek Slough and the East Fork. According to plaintiff, the dynamite did not solve the sedimentation problem, so plaintiff repeated the process with a second case of dynamite on July 6. The second case of dynamite removed the sediment and permitted the water on plaintiff's field to flow back into the East Fork. Plaintiff did not explain how or why, having cured the sedimentation problem on July 6, excess sediment was present on the riverbed on July 26–27. At one point during cross-examination, defense counsel asked plaintiff to describe how sediment moves through out the river system. Plaintiff could not offer a response that was probative of whatever point he was trying to make:

Q Now what do you attribute the difference between July 27, 1991 and yesterday?

A Sedimentation.

Q And does sedimentation appear and disappear?

A I don't know.

Q You have no idea?

A It must do. It moves around the river, I know that. You can go up the river one day and you'll hit bottom in one place and go back the next day and it'll be moved from there. I do know that.

If the sediment was removed on July 6, 1991, the court would need to know that some event or series of events caused it to reappear in a mere 21 days. Given that plaintiff failed to address this essential question, the court cannot find that there was excess sedi-

ment on the bed of the river on July 26–27, 1991.[16]

Plaintiff introduced into evidence section 1.1 of a Corps study entitled "Investigation of Hydrologic, Hydraulic and Sediment Characteristics of the East Fork of the Tombigbee River." The section reads, in part: "The FWS [Fish and Wildlife Service] believes that this sediment is from a number of sources; including headcutting from channelized western tributaries, clearing and snagging activities in the East Fork, and bank erosion in the East Fork...." Although the provision does refer to sediment, plaintiff never explained the context in which the section was written or how it relates to the July 26–27, 1991 sedimentation problem. In fact, the sedimentation problem discussed in section 1.1 of the Corps report refers to a concern of the U.S. Fish and Wildlife Service, expressed in 1987, that sediment in a portion of the East Fork was affecting three fresh water mussel species. The report addresses a concern voiced almost four years prior to the event at issue in this case. Moreover, the provision does not address how sediment in the East Fork affects the flow of the river.

Plaintiff also attempted to introduce into evidence two sections from a study jointly prepared by the Corps and the Soil Conservation Service ("SCS") entitled "Preliminary Investigative Report East Fork Basin, Mississippi." Section 6.10 states, in part:

One of the most significant threats to the aquatic ecosystem in the East Fork is instream sediment accumulation. The Corps (1989) found that the channelized western tributaries contribute almost 2 million cubic yards of sediment to the East Fork, annually. Evidence presented by the Corps (1989) suggests this far exceeds the capacity of the East Fork to transport sediments. As a result, much of these sediments are accumulating in the East

16. Plaintiff's testimony about the sedimentation problem on July 5–6, 1991, also adversely affects other parts of plaintiff's case. Since filing his complaint, plaintiff has maintained that the catfish pond field was dry during the month of July until the July 27, 1991 flood: "Plaintiff's property, of course, became wet during the heavy

Spring rains. The property, however, was very dry during the entire month of July 1991." Plf's Br. filed Mar. 22, 1996, at 12. However, if plaintiff's property did flood on July 5, 1991, it certainly was not dry during the entire month. Plaintiff never resolved these contradictory portrayals of the condition of his land.

Fork flood plain as well as within the channel. . . .

Section 6.11 reads:

Sediment deposited in and adjacent to the channel downstream of Twenty mile Creek killed several hundred acres of bottomland hardwoods on the John Bell Williams WMA during the early 1980's. The timber was apparently killed by a combination of sediment deposition and waterlogging resulting from low flows being diverted from the channel by sediment blockages. The very productive oak wetland association was replaced by a much less productive green ash and willow association. This significantly reduced the wildlife productivity of the impacted area. As discussed earlier in this report, significant flows are once again being diverted out of the East Fork channel by sediment blockages between Walkers Road and Donivan Creek.

These portions of the Corps and SCS study do not prove that excess sediment existed on the bed of the East Fork adjacent to plaintiff's property on July 26–27, 1991. The report references Corps findings made in 1989, not 1991, and discusses blockages above plaintiff's property.[17] While plaintiff might have called a competent witness to connect the statements to plaintiff's property and the events in question, plaintiff did not do so.[18]

Plaintiff's testimony and the portions of the Corps studies introduced into evidence are insufficient to prove that the Corps action caused the flood. Plaintiff was unable to explain how much sediment accumulated in the portion of the East Fork adjacent to his property. Nor could plaintiff articulate how sedimentation is transported from one point to another along a river bed. Although the Corps studies contain some indication of a sedimentation problem, plaintiff could not interpret the studies for the court. The court recognizes that plaintiff is not an expert witness, but plaintiff made the strategic decision not to offer any additional testimony as to the amount or basic phenomenon of sedimentation. As the court noted at the conclusion of trial, the court did not grant defendant's Rule 52(c) motion because of the absence of expert testimony.[19] The court would have

---

**17.** The court struck section 6.11 as it did not address the affected flows and therefore confused the record. Fed.R.Evid. 403. For purposes of this ruling however, the court has decided to consider all of plaintiff's references to Corps documents.

**18.** Unfortunately, other instances occurred during the course of the trial when a witness for plaintiff offered testimony, but failed to demonstrate the significance of the offering. For example, Mr. Guin testified that the banks of the East Fork had decreased in height over the last 25 years. Yet, Mr. Guin never explained how the decrease in bank height was probative of increased sediment. At one point during the trial, the court even encouraged plaintiff to explain the significance of the decreased banks:

Now whether—the significance of the banks, I would like to explore because I did notice a difference and I recorded it as somewhat different. There were more crevasses on Mr. Cooper's property, which I understand is indicative of flooding activity. And the banks certainly on the west as we traveled south ultimately were no more than a slope in places and I'm interested in exploring this in terms of what it means for causation of the flooding in this case.

**19.** A substantial body of case law in the Court of Federal Claims stands for the proposition that proof of causation in flood and erosion cases is a complex issue best addressed by experts. As the former United States Claims Court explained:

Ascertaining the cause of such a complex natural occurrence requires the analysis of many variables and cannot be reduced to simple answers. Therefore, this is a case in which the testimony of experts is particularly appropriate, given the fact that the court has been presented with evidence of a highly technical nature involving geotechnical, hydrologic, hydraulic, geological and climatic matters.

*Baskett v. United States*, 8 Cl.Ct. 201, 212 (1985), *aff'd*, 790 F.2d 93 (Fed.Cir.1986) (Table); *see Loesch*, 227 Ct.Cl. at 45, 645 F.2d at 914 (containing similar language); *Herriman v. United States*, 8 Cl.Ct. 411, 420 (1985) (same). In this case the court was led to believe that plaintiff would offer lay witnesses with firsthand, personal knowledge of the facts relating to causation. Therefore, the court was not particularly concerned with the fact that plaintiff was planning to put on his case without the aid of an expert. Nonetheless, as the case unfolded, it became clear that plaintiff's lay witnesses could not explain how sediment accumulates and travels along a river system. While the court does not penalize plaintiff for not utilizing an expert on the subject of sedimentation, parties in a position similar to plaintiff would be well-advised to recognize the complexity of proving causation in a flood case and seek the assistance of witnesses with special expertise.

accepted credible lay testimony about sedimentation. The fact remains, however, that the record is devoid of any persuasive testimony, be it lay or expert, that supports plaintiff's theory that the sedimentation, in combination with the Corps releases of water, caused the flooding of plaintiff's property.

As the above discussion reveals, plaintiff's proof that sedimentation played a causative role in the July 26–27, 1991 flood is materially deficient. Moreover, plaintiff's testimony was not credible. The court is troubled by plaintiff's testimony that there was two feet more of sediment on the East Fork bed in July 1991 than at present. Although plaintiff, after a question by the court, withdrew his testimony, the fact that plaintiff made the representation in the first place demonstrates a willingness to proffer unsubstantiated theories.

This is not the first instance in which plaintiff has presented unsupported hypotheses to the court. When the parties were briefing the issue of summary judgment, defendant submitted a technical report prepared by Dr. LaMoreaux. Dr. LaMoreaux wrote that he had visited plaintiff's property and that he did not observe water flowing from the East Fork onto the property. In response to Dr. LaMoreaux's technical report, plaintiff submitted an affidavit, as follows:

I have read the declaration and technical report of Philip E. LaMoreaux, Sr. His findings and opinions as to the cause of the flooding are misleading because, like Underwood's, they are based upon the visits that he made to my property in late 1995 after Lock E was adjusted to restrict the flow of water into Mackey[s] Creek. What LaMoreaux observed on his visits is misleading because the defendants were manipulating the water flow of Mackey[s] Creek in order to decrease the water volume in the East Fork.

Affidavit of Jack Cooper, Mar. 11, 1996, ¶ 4.

At trial defense counsel asked plaintiff about his basis for accusing the Corps of manipulating releases from the Lock E spillway:

Q Do you believe it [the charge of manipulation] to be true today?

A No, I don't. I changed my mind yesterday.

Q You changed your mind yesterday?

A Yes, sir.

Q So what you were stating was not true, is that correct, in this affidavit?

A That's right.

Q What did you see yesterday to change your mind?

A Well, I watched the—I saw the minimum-flow structures and watched how they worked. I was at the lock yesterday when they called Fulton and they said they had a reading of 8.2. When I got down to the place, my place wasn't flooded. In 1991—in 1991 on September the 10th when Mr. White was down there, on his note, he said the reading that day was 7.3 and my field was really flooded. So, you see, I was just mistaken about it, but I thought I was telling the truth.

While the court does not ascribe any animus to plaintiff's testimony, the court finds plaintiff to be desperately seeking to blame the Corps for the unfortunate damage to his property. When explaining why he believed that the Corps had manipulated the spillway releases, plaintiff stated: "Well, you know, when I wrote that thing, I really thought I was telling the truth. I've had so—the Corps has done so many things to [ ] me, it seemed like everything they did was, you know, against me."

 Plaintiff has come forward with little, if any, probative evidence to connect the Corps to the July 27, 1991 flood. When a comparison of the July 27, 1991 and September 30, 1996 river depths revealed serious problems with plaintiff's original theory, plaintiff put forth the new hypothesis that increased sediment caused a lower-flowing river to exceed its banks. Although such a theory is possible, plaintiff did not take the necessary steps to prove that there was increased sediment in the East Fork at or near his property during the end of July 1991 or that the amount of increased sediment, if it existed, would cause the river to flood. Plaintiff is the party seeking affirmative re-

lief from the court, so he bears the burden of proving that the Corps was the direct and natural cause of the flood. "The United States is not liable for flood damages unless directly attributable to government action." *Bartz v. United States*, 224 Ct.Cl. 583, 593, 633 F.2d 571, 577 (1980). Because plaintiff has failed to prove that it is more likely than not that the Corps caused the flood in question, the court grants defendant's motion pursuant to RCFC 52(c).[20]

## CONCLUSION

Accordingly, based on the foregoing, the Clerk of the Court shall enter judgment for defendant.

**IT IS SO ORDERED.**

---

20. In connection with the court's ruling on defendant's Rule 52(c) motion, plaintiff's counsel took issue with the court's order of July 20, 1995, which established a schedule for designating expert witnesses. Because the deadline for designating experts was ambiguous, the court carefully has considered whether this order prejudiced plaintiff's case. On November 20, 1995, plaintiff moved to extend the time for designating experts. Defendant opposed plaintiff's request on December 1, 1995, voicing as a principal concern that granting plaintiff's request would not afford defendant an opportunity to depose late-designated witnesses and also arguing that plaintiff had not justified his request to prolong the discovery period. Given the parties' competing views, the court eagerly awaited plaintiff's reply brief. This brief, however, did not arrive within the time period prescribed by the court's rules. After plaintiff's time for filing a reply brief expired, the court on January 2, 1996 denied plaintiff's motion for an extension of time to designate expert witnesses. Plaintiff did file a reply brief and it was late, although the Clerk's Office rejected it for another reason—lack of authorized signature. Sometime later he refiled the motion with the required signature, which the court denied as untimely.

When a party files a brief out of time, the party must justify the delay. Plaintiff never did so. Even when one puts aside the fact that the Clerk's Office returned plaintiff's reply brief unfiled and that the Clerk's action explained why plaintiff's brief was late for the second time, the fact remains that the brief was late the first time and late without explanation.

Nonetheless, plaintiff still had opportunities to alert the court of his need to employ the services of an expert witness. When defendant moved for summary judgment, plaintiff could have filed a motion pursuant to RCFC 56(g). When plaintiff submitted his pretrial filings, plaintiff could have asked for permission to designate an expert witness. Plaintiff could have made this same request during the July 10, 1996 status conference or the September 24, 1996 pre-trial conference. However, plaintiff remained silent.