BALDWIN, Circuit Judge.
 

 This is an appeal from the judgment of the United States Claims Court
 
 [1]
 
 regarding a claim by The City of Van Burén, Arkansas (Van Burén), that it suffered a compensable taking under the Fifth Amendment by the government’s appropriation of a subterranean flowage easement in certain land, resulting in damage to Van Buren’s sewer system occupying a utility easement in that land. Judge Merow, the trial judge, held that Van Burén was entitled to compensation for a taking by the government. We affirm.
 

 Background
 

 In 1964, Van Burén completed replacing its outmoded sewer system with a new one which included pipelines, called “outfall lines,” connecting the city’s collection system with a sewage treatment plant. The outfall lines were buried in the Arkansas River alluvial plain and were constructed of extra-strength vitrified clay pipe sections coupled by polyurethane pressure joints. Connections of this kind were generally recognized to be less than watertight in practice, thereby increasing the possibility of infiltration of groundwater and soil into the joints. Notwithstanding this contingency, the plans and specifications for the Van Burén sewer system did not comprehend variations in ground water levels which might have affected the frequency and rate of infiltration into the lines. Instead, Van Buren’s engineers considered the groundwater level extant at the time of the system’s design and construction, that being under 380 feet mean sea level (m.s.l.).
 

 At this level, the groundwater was well below the lowest invert elevation (384.25 feet m.s.l.) of the outfall lines,
 
 [2]
 
 where it remained for approximately a year after the system was completed. Thereafter, between April and December of 1968, Van Buren’s outfall lines experienced two “failures,”
 
 [3]
 
 both at times when the water table was elevated sufficiently to inundate the lines along some portion of their lengths.
 

 In December, 1969, the U.S. Army Corps of Engineers closed lock and dam No. 13 (dam) on the Arkansas River as part of a project to improve flood and erosion control, provide recreational opportunities, and the like. Subsequently, the groundwater level began to rise gradually, reaching 389 feet m.s.l. in March, 1970, when a third failure along the outfall lines occurred and, according to the trial judge, the taking was effected. After this failure, a consulting engineer employed by Van Burén recommended that the city abandon its policy of repairing the lines as failures occurred and that the lines should be replaced, at an estimated cost of $200,000. Three more failures occurred between October, 1970, and February, 1973, during which time (and since) the groundwater fluctuated between 390 and 395 feet m.s.l.
 
 [4]
 
 After the sixth
 
 *1060
 
 failure, Van Burén constructed lift stations and force mains to bypass the outfall lines.
 

 After trial, the trial judge held that “[b]y raising the groundwater level * * * defendant has made it impractical for plaintiff to use vitrified clay pipe in these areas and more expensive for plaintiff to repair any failures in the pipelines. Thus, a taking occurred within the meaning of the fifth amendment.” He rejected the government’s contention that it was the poor design of the sewage system rather than the government’s flooding that caused the failure of the outfall lines. Finally, the trial judge stated that “in calculating any award for plaintiff, any benefits plaintiff received from the improvements of the Arkansas River must be considered” and that “[b]enefits from the river improvements, such as flood control, undoubtedly must also receive consideration.”
 

 DISCUSSION
 

 The government maintains that Van Burén failed to prove by a preponderance of the evidence that the closing of the dam on the Arkansas River was “the direct and proximate cause of the outfall line failures of [Van Buren’s] sewer system.” In addition, the government argues that the trial judge erred as a matter of law by failing to weigh the dam’s benefits to Van Burén against the dam’s detrimental impact when he determined whether any taking at all had occurred. The government does not deny that, if the dam’s closing was the proximate cause of the outfall line failures and if the benefits to Van Burén were properly ignored by the trial judge, then there was a taking.
 

 Causation
 

 The government’s position is “simply that the underlying or proximate cause of the outfall lines failures was * * * initial improper design, i.e., the use of vitrified clay pipe, and that if * * * iron pipe (with a water tight joint) had been used, there would have been no failures.” Elaborating its position, the government asserts that natural groundwater levels experienced pri- or to closure of the dam assured that the outfall lines were “flooded for sustained periods” and, consequently, Van Buren’s failure to take into account natural groundwater fluctuations was the “proximate” cause of the post-closure failures.
 

 We may assume, as the government urges, that some failures in the outfall lines would have occurred over time even had the dam never been built. Nevertheless, the evidence amply supports the trial judge’s conclusion that closure of the dam significantly increased the cost of repairing failures and rendered impractical the use of vitrified clay pipe in the affected areas because of the permanently raised water table.
 
 [5]
 
 On this record, then, we find no basis for questioning that closure of the dam in fact caused Van Buren’s having to replace the outfall lines.
 

 However, the government seeks in effect to shift away the legal responsibility for the dam’s adverse consequences by identifying a “proximate” cause in Van Buren’s allegedly negligent design of the lines.
 
 [6]
 
 Yet there was convincing testimony by experts on sewer design that the use of polyurethane joints and vitrified clay pipe was not negligent under the circumstances, given the distance of the outfall lines from the river and the economic constraints imposed
 
 *1061
 
 on the system’s design by Van Burén voters.
 
 [7]
 
 Accordingly, we cannot sustain the government’s contention that the proximate cause of the outfall lines’ replacement was an improper use of vitrified clay pipe in the original construction.
 

 Relative Benefits
 

 The government asserts that “substantial benefits” to Van Burén from the dam’s closure, for example, in the form of bank stabilization, flood control, and lowered costs for river transportation, “clearly outweigh the detriments” to Van Burén, and that the trial judge erred as a matter of law by failing to consider this fact in determining whether a taking had occurred. In this context, the government relies on
 
 John B. Hardwicke Co. v. United States,
 
 467 F.2d 488, 490 (Ct.Cl.1972), where the court, citing
 
 United States
 
 v.
 
 Miller,
 
 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943), stated:
 

 [A] condemnor need not compensate a landowner for value which the condemn- or creates by the establishment of the project for which the landowners [sic] land is condemned * * *. The same principle is for application when, in a flooding case, the question is whether property is taken at all.
 

 The
 
 Hardwicke
 
 court also quoted Mr. Justice Black, who stated in the context of an earlier flooding case that:
 

 [I]f governmental activities inflict slight damage upon land in one respect and actually confer great benefits when measured in the whole, to compensate the landowner further would be to grant him a special bounty.
 

 United States v. Sponenbarger,
 
 308 U.S. 256, 266-67, 60 S.Ct. 225, 229, 84 L.Ed. 230 (1939).
 

 The government’s theory of relative benefits is fatally flawed in at least two respects. First, the precedent cited as its supportive authority is, in fact, not applicable to the case at hand. In
 
 Miller,
 
 for example, the Supreme Court considered the government’s liability under the Fifth Amendment to a property owner whose land had been enhanced in value, prior to condemnation, by the federal project for which the owner’s land was subsequently taken. The Court in
 
 Miller
 
 held that the government under such circumstances would not be liable for the portion of the property’s value resulting from the federal project if the property was within the initial scope of the project. 317 U.S. at 376-77, 63 S.Ct. at 281-82.
 
 See Hartwig v. United States,
 
 485 F.2d 615 (Ct.Cl.1973).
 

 Thus, application of the “Miller Doctrine” necessarily presupposes that the property owner seeks to recover the increment in property value effected by a federal project
 
 prior
 
 to condemnation. To the contrary, however, Van Burén in this case alleges the taking of property (the flowage easement) the value of which was unaffected before condemnation by any federal improvement. Accordingly, since no increase in the value of the property resulted from the dam’s closure prior to condemnation of Van Buren’s flowage easement, neither
 
 Miller
 
 nor its elaboration in
 
 Hardwicke
 
 is pertinent here.
 

 Similarly, we consider
 
 Bauman v. Ross,
 
 167 U.S. 548, 17 S.Ct. 966, 42 L.Ed. 270 (1896), and its progeny to be inapposite to
 
 *1062
 
 the facts before us. The legal principle enunciated in
 
 Bauman,
 
 167 U.S. at 574-75, 17 S.Ct. at 976-77, and restated in
 
 U.S. v. Sponenbarger,
 
 308 U.S. at 256, 266-67, 60 S.Ct. at 229, (1939), was grounded on a finding that the government had inflicted only “slight damage” on the property allegedly taken, and had “in substance take[n] nothing from the landowner.” 308 U.S. at 267, 60 S.Ct. at 229. Under such circumstances, a denial of recovery does not offend the concept, underlying the Fifth Amendment’s “taking” provision, of “the injustice in favoring the public as against an individual property owner.” 308 U.S. at 266, 60 S.Ct. at 229.
 

 In contrast, there is nothing in the trial record here demonstrating that the injury sustained by Van Burén to its property was de
 
 minimis
 
 compared to benefits to that property conferred by the dam’s closure. Compare
 
 ARK-MO Farms v. United States,
 
 530 F.2d 1384, 1486 (Ct.Cl.1976) (property allegedly taken found to have directly benefited far in excess of any “little injury” suffered from federal project). We remain unconvinced, notwithstanding the government’s broad references to dam-related improvements which accrue to the public, such as erosion control, that Van Burén has, in the balance, lost nothing by the forced choice between its sewer system, as originally designed, and the benefits of the federal project. The benefits alleged by the government have neither offset nor rendered minimal the damage Van Burén suffered.
 

 The government’s theory is also flawed by its failure to distinguish general from special benefits received by Van Burén from the dam’s closure.
 
 See, e.g., United States, ex rel. Tennessee Valley Authority v. Indian Creek Marble Co.,
 
 40 F.Supp. 811, 820-21 (E.D.Tenn.1941), and cases cited therein. This distinction is made most commonly in the calculation of awards after a taking has been established,
 
 see, e.g.,
 
 33 U.S.C. § 595 (1918) (for a partial taking, only “special and direct benefits” to the remaining property are considered in awarding compensation or assessing damages). However, it is appropriate to emphasize here, where the government denies that any taking at all occurred, that only benefits inuring specifically to the condemnee, rather than to the community at large, are relevant to an analysis of the government’s liability under the Fifth Amendment. Thus, while there may be a diversity of opinion on what constitutes a “special” benefit in this context, it appears beyond question that such a benefit must be associated with the ownership of particular property affected by the alleged taking.
 
 See Bartz v. United States,
 
 633 F.2d 571, 577-78 (Ct.Cl.1980),
 
 cert. denied,
 
 450 U.S. 967, 101 S.Ct. 1484, 67 L.Ed.2d 616 (1981) (specific benefits to farmlands allegedly taken by federal dam project held far to outweigh adverse impact of project on those same lands).
 
 [8]
 
 In the present case, the government has not identified specific benefits of this nature, instead relying, as we have noted, on a listing of the public benefits that flow from nearly all flood control projects. As a matter of law, we find such a recitation to be insufficient to vitiate Van Buren’s taking claim.
 

 In view of the foregoing, we cannot sustain the government’s contention that the trial judge erred in failing to consider the benefits cited by the government when he determined whether a taking had occurred.
 

 The judgment of the United States Claims Court is
 
 affirmed.
 

 AFFIRMED.
 

 [1]
 

 . Pursuant to the order of this court dated October 4, 1982, Judge Merow entered a judgment on October 8, 1982, corresponding to the decision recommended in this case.
 

 [2]
 

 . “Invert elevation” refers to the depth of pipe relative to the inside of the pipe’s bottom edge. The invert elevation of Van Buren’s outfall lines ranged between 394.24 feet m.s.l. (shallowest) and 384.25 feet m.s.l. (deepest).
 

 [3]
 

 . “Failure” here means the collapse of some portion of the line, possibly resulting in a stoppage of flow through the collapsed section. Inflow of groundwater into a pipe can carry with it the bedding or other material surrounding the pipe, causing the formation of a cavity around the pipe. Cavitation of this sort can lead to collapse of the pipe and failure of the sewer.
 

 [4]
 

 . A seventh failure occurred in June, 1974, at the end of the line furthest from the treatment plant, where the line was joined to the city’s collection system. At oral argument, counsel for Van Burén stated that a portion of the line
 
 *1060
 
 associated with the seventh failure had been in operation since 1907.
 

 [5]
 

 . Van Buren’s expert on sewer design, James D. Mickle, testified that “[u]nder a condition where [gravity sewer] pipe is continuously immersed or the water level is above it on a permanent basis, this increases the statistical probability of failure.” Mickle also testified that, in his experience, “the cost of correcting a failure [is] increased tremendously with the permanent water table.” Mickle’s testimony is consistent with the statements of a government witness, Gene Daniel, who testified that, after studying the Van Burén system in 1970, he had concluded that the post-closure, elevated water table would bring about future failures in the lines.
 

 [6]
 

 . For example, at oral argument government counsel questioned “why * * * the government [should] have to pay for * * * errors” committed in the design of Van Buren’s sewer system.
 

 [7]
 

 . Mickle, Van Buren’s expert witness, agreed during direct examination that Van Buren’s design was “a reasonably proven [one] taking into account all the information [recognized] as the standards in this area * * * in 1963-1964.” In cross-examination, Mickle testified that, given the lines’ proximity to the river, he would have anticipated flooding by groundwater for periods of weeks at most; and that, had he anticipated submersion at about 390 m.s.l. for as long as two months, he still would have been only “concerned,” noting that “whether we would have changed [the design under these circumstances] would have depended a lot on what the finances of the project were.” Mickle’s conclusions find support in the uncontroverted testimony of Van Buren’s current city engineer, John N. Rogers, that the Van Burén system was designed in accordance with the standards of “a reasonably prudent engineer in this area.”
 

 Although there was contrary evidence of record on this point, based on the foregoing and other evidence presented we agree with the trial judge’s determination that Van Burén was not negligent in its design and construction of the sewer system.
 

 [8]
 

 . In passing, we note that the trial judge cited
 
 Bartz
 
 for the proposition that, “in calculating any award for [Van Burén],
 
 any
 
 benefits [Van Burén] received from the [dam-related] improvements * * * must be considered.” (Emphasis added.) In light of what we have said here, the trial judge’s reading of
 
 Bartz,
 
 apparently dictum in his opinion, must be considered too sweeping.