**Henry HENDLER, Paul Garrett and Tillie Goldring as Trustees for Henry Hendler and Irving Gronsky, Plaintiffs–Appellants,**

v.

**UNITED STATES, Defendant–Appellee.**

**No. 97–5143.**

United States Court of Appeals, Federal Circuit.

May 11, 1999.

John D. Hoffman, Ellman, Burke, Hoffman & Johnson, A.P.C., San Francisco, California, argued, for plaintiffs-appellants. With him on the brief were Howard N. Ellman and David H. Blackwell. Of counsel on the brief was Paul Hamilton, Jeffer, Mangels, Butler & Marmaro, LLP, Los Angeles, California. Of counsel was Kenneth N. Burns, Ellman, Burke, Hoffman & Johnson, A.P.C., San Francisco, California.

David C. Shilton, Environmental and Natural Resources Division, U.S. Department of Justice, Washington, DC, argued, for defendant-appellee. With him on the brief were Lois J. Schiffer, Assistant Attorney General, Robert L. Klarquist, David F. Shuey, and Eric S. Gould, Attorneys, General Litigation Section. Of counsel on the brief were David Coursen, Attorney, Office of General Counsel, U.S. Environmental Protection Agency, Washington, DC and Laurie Williams, Attorney, U.S. Environmental Protection Agency, San Francisco, California.

Before PLAGER, Circuit Judge, ARCHER, Senior Circuit Judge, and CLEVENGER, Circuit Judge.

PLAGER, Circuit Judge.

In this takings case, we approach the final chapter in a decade-long dispute between the landowners and the Government. The dispute was initiated when the Government entered upon the land of the plaintiffs, without their consent and over their objection, for the purpose of sinking wells for monitoring of ground water migration from adjacent properties. Over time the Government continued to establish additional wells and to service them, all without payment to the landowners for the use of their property. The landowners sued, claiming inverse condemnation.

After several false starts at the trial level, see Hendler v. United States, 11 Cl.Ct. 91 (1986) ("Hendler I"); Hendler v. United States, 19 Cl.Ct. 27 (1989) ("Hendler II"), this court determined that plaintiffs had a good cause of action. We held that the Government, however well motivated and however important its cause, must adhere to fundamental Constitutional principles: if private property is taken for public use, just compensation must be paid. See Hendler v. United States, 952 F.2d 1364 (Fed.Cir.1991) ("Hendler III"). The cause was remanded to the trial court for further proceedings.

Subsequently, the Court of Federal Claims undertook to determine, on the facts of the case, what was the just compensation mandated by the Constitution. After trials on liability theories and damages issues, the Court of Federal Claims determined that plaintiffs ultimately were due no compensation. See Hendler v. United States, 36 Fed.Cl. 574 (1996) ("Hendler IV"); Hendler v. United States, 38 Fed.Cl. 611 (1997) ("Hendler V"). Plaintiffs appeal that judgment, and the findings that underlay it.

## BACKGROUND

The detailed background of the case is described in the prior opinions, Hendler I–V. We provide here a brief overview. The subject property is an approximately 100–acre tract of land in southern California, near the city of Riverside. Plaintiffs first acquired the property for investment purposes in 1960, at which time the area was largely agricultural. They planned to hold the property until economic conditions favored commercial development, at which time they expected to sell the land to a developer. See Hendler IV, 36 Fed.Cl. at 576–77.

The property is located near and 'downstream' of a seventeen-acre former rock quarry that, under the auspices of the State of California, was converted in 1952 to a toxic-waste disposal site serving many manufacturing companies associated with the aerospace industry. This site became

known, infamously, as the Stringfellow Acid Pits ("Stringfellow"). *See id.* at 577. In 1969, Stringfellow became a source of public concern when heavy rains caused the acid pits to overflow, releasing toxic chemicals to lower-lying areas, including plaintiffs' property. *See id.* In 1972 waste disposal at Stringfellow was stopped; not long afterward it was discovered that toxic chemicals had seeped into the groundwater aquifer below Stringfellow. The site was declared a public nuisance in 1975, but large-scale cleanup efforts did not begin until 1980. *See id.*

The State of California and the United States, acting through the U.S. Environmental Protection Agency ("Government"), undertook cleanup efforts pursuant to federal authority under CERCLA,[1] commonly known as Superfund. As part of its efforts, the Government decided to locate wells and associated equipment on plaintiffs' property to monitor the movement of the contaminated groundwater from Stringfellow. When the Government approached plaintiffs with this proposal, plaintiffs resisted. *See id.* at 577–78. Shortly thereafter, in 1983, the Government issued an order (herein "access order") mandating that government officials, including both state and federal officials and their agents, were to have access to plaintiffs' land for purposes of installing wells and related equipment, and conducting tests and other related activities. The access order further ordered that plaintiffs were not to interfere in any manner. *See id.* at 578–79.

Well-drilling then began on plaintiffs' property. Over the course of the following three years, twenty wells were installed on the property. During this period and well beyond, Government officials and agents periodically entered the property to monitor the groundwater, using the installed wells. *See id.* at 579. Based on information derived from the wells, a plume of contaminated water from Stringfellow was located flowing directly under portions of plaintiffs' land, and on down to lower-lying communities. *See id.*

The Government undertook extensive cleanup and remediation activities at Stringfellow. Groundwater samples since taken from the wells on plaintiffs' property have shown these efforts to have been successful. The groundwater contamination under plaintiffs' property has been greatly reduced, to the extent that, it is reported, the groundwater as of May 1995 has been restored almost to its pre-polluted condition, nearly meeting drinking water standards. *See id.* at 579–80.

In 1994 the Government formally terminated the 1983 access order. *See id.* at 580. As noted, the litigation triggered by the order had started some ten years earlier when plaintiffs filed suit against the Government in the Claims Court (now the Court of Federal Claims). This was shortly after the Government began installing the wells on their property. In their suit, plaintiffs claimed that their property suffered a regulatory and physical taking by way of the access order and the associated activities taken thereunder on their land; they sought just compensation for the alleged takings.

In *Hendler II*, 19 Cl.Ct. 27, the trial court dismissed plaintiffs' suit on procedural grounds, and entered a final judgment. In *Hendler III*, 952 F.2d 1364, we reviewed the dismissal, as well as prior rulings on the merits by the trial court in *Hendler I*, 11 Cl.Ct. 91, which we determined to be properly before us. We reversed the dismissal and concluded that the trial court should have entered summary judgment for plaintiffs on their physical taking claim, opining that "the Government behaved as if it had acquired an easement...." *Hendler III*, 952 F.2d at 1378. We also noted with respect to the

---

1. The Comprehensive Environmental Response, Compensation, and Liability Act, 42

U.S.C. § 9601 *et seq.*

physical taking that plaintiffs would have "the opportunity to establish their severance damages, the damages accruing to their retained land as a result of the taking." *Id.* at 1383–84. With respect to plaintiffs' regulatory taking claim, we indicated concurrence in the trial court's view that the access order did not, alone, effect a regulatory taking. *See id.* at 1375. However, we noted that "subsequent events . . . might have had sufficient economic impact on the plaintiffs to constitute a regulatory taking." *Id.*

On remand, the trial court bifurcated the trial between the liability issues and damages. The liability issues were reviewed and resolved in *Hendler IV*, 36 Fed.Cl. 574, and damages in *Hendler V*, 38 Fed.Cl. 611, though evidence relevant to damages was heard in both trial phases. In *Hendler IV*, the trial court determined that the physical taking was in the form of well-site and access-corridor easements. 36 Fed.Cl. at 584. Specifically, the court found that each well-site easement "comprises a 50 by 50 foot square area for activities related to the well(s) contained therein," and that each access-corridor easement comprises a "16 foot wide access corridor [from a well-site] to a public right of way." *Id.* With regard to the regulatory taking issue, the court determined that there had been no regulatory taking because, among other reasons, in its view the nuisance doctrine defeated the claim and there was insufficient adverse economic impact on plaintiffs. *See id.* at 586–88.

In the damages trial, the court heard evidence on the valuation of the well-site and access-corridor easements, as well as evidence as to whether and to what extent plaintiffs' remaining property was harmed or benefited from the Government's activity on their land. The court found that neither the easements nor the access order damaged the remaining part of plaintiffs' property, and hence determined that the remaining part suffered no compensable severance damage. *See Hendler V*, 38 Fed. Cl. at 622. The court further deter-

mined that plaintiffs' remaining property received substantial "special benefits" and that those benefits outweighed the value of the easements taken. As a consequence, the court concluded that plaintiffs are due no compensation for the value of the easements, and plaintiffs were awarded no compensation for the access order and the Government's activities thereunder. *See id.* at 626–27.

Plaintiffs appeal, asserting that the trial court erred in denying them compensation for the partial physical taking of their land, both for the value of the part taken and severance damages to the remainder. Plaintiffs also assert that the trial court erred in determining that there has not been a regulatory taking of their land. We consider these issues in turn.

## DISCUSSION

### I.

▉ We review the judgment of the Court of Federal Claims to determine whether it is premised on errors of law or clearly erroneous factual findings. *See Whitney Benefits, Inc. v. United States,* 926 F.2d 1169, 1171 (Fed.Cir.1991). The trial court's findings regarding the property's value, nature, and alternative uses, as well as the extent to which the property's use is limited by the Government's actions, are all reviewed for clear error. *See id.* at 1172–73, 1177–78. Also reviewed for clear error are the court's findings on causation. *See Loesch v. United States,* 227 Ct.Cl. 34, 645 F.2d 905, 913 (1981).

▉ Under the clear error standard of review, a finding is clearly erroneous, even though there is some supporting evidence in the record, when the reviewing court, based on the entire record, "is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). This standard gives considerable deference to the trial court's factual findings. Conclusions of law, however, are

"subject to full and independent review," without deference to the trial court. *Gardner v. TEC Sys., Inc.*, 725 F.2d 1338, 1344, 220 USPQ 777, 782 (Fed.Cir.1984) (en banc).

## II.

## COMPENSATION FOR THE PART TAKEN

■ With regard to the partial physical taking of plaintiffs' land in the form of the well-site and access-corridor easements, plaintiffs argue that the trial court erred in rejecting their expert's valuation of the easements as of 1983 at $67,364 (which with interest to 1996 totaled $185,000). Plaintiffs' valuation was based on the scope of use permitted under the access order, rather than on the Government's actual use. *See Hendler V*, 38 Fed. Cl. at 619. They additionally assert that the trial court erroneously determined that their retained land (the part not taken) received special benefits as a result of the· taking.

The trial court's conclusion that plaintiffs are not entitled to compensation for the value of the part of their property taken hinged on this latter determination, that the retained property received special benefits. In particular, the court determined that the special benefits conferred on the property as a result of the taking more than offset the value of the easements—even under plaintiffs' valuation—and hence no compensation therefor is due. *See id.* at 626–27. Accordingly, we first consider plaintiffs' arguments that the trial court erred in its special benefits determination.

An initial question is whether special benefits to retained land can offset the value of the part actually taken (here, the well-site and access-corridor easements). Such a setoff against the value of the part taken is prohibited under the law of most states. *See* 3 Julius L. Sackman et al., *Nichols on Eminent Domain* § 8A.03 (rev.3d ed.1998) (hereinafter *"Nichols"*). Rather, most states permit a setoff of spe-

cial benefits only against the losses, caused by the partial taking, to the property remaining in the owner's hands, *i.e.*, against so-called "severance damages." *Id.* The rationale is that, with regard to the property actually taken, the landowner is entitled to its full value; but with regard to severance damages, the damages to the property remaining in the owner's hands, these are measured by the net of the damages, *i.e.*, losses less benefits. In this way the land owner is fully compensated for what is taken, and is left no better or worse off as a result of the taking.

Before the trial court, plaintiffs contended that under California law special benefits cannot offset the value of the easements taken, but rather can only offset severance damages. *See Hendler V*, 38 Fed. Cl. at 617. The trial court rejected this argument, concluding as a matter of law that federal law governs, and implicitly concluding that federal law permits such an offset. *See id.* As the authority for these conclusions, the court cited *Bartz v. United States*, 224 Ct.Cl. 583, 633 F.2d 571 (1980), a decision of this court's predecessor. *See Hendler V*, 38 Fed. Cl. at 617.

The trial court's conclusions find support in the law. In *Bartz,* the Court of Claims observed that the issue of what constitutes a taking by the federal government is a federal question. The court held that federal law rather than state law governed whether benefits conferred by the construction and operation of a dam could be considered in deciding what compensation is due for an alleged taking of farmland by recurring flooding allegedly caused by the dam. *See Bartz,* 633 F.2d at 576–77. In concluding that the landowners were due no compensation, the *Bartz* court reasoned that the damages caused by the flooding "were heavily countervailed by the benefits to the farmlands as a whole.... " *Id.* at 577–78.

In *Bauman v. Ross,* 167 U.S. 548, 17 S.Ct. 966, 42 L.Ed. 270 (1897), the Supreme Court held constitutional a federal

statute that called for considering special benefits when deciding what compensation is due for the taking of part of a tract of land for a highway. The Court observed that the statute was in accord with prior views of the matter as stated in *Kennedy v. Indianapolis*, 103 U.S. 599, 605, 26 L.Ed. 550 (1881), and further stated:

> [W]hen part only of a parcel of land is taken for a highway, the value of that part is not the sole measure of the compensation or damages to be paid to the owner; but the incidental injury or benefit to the part not taken is also to be considered.... If, for example, by widening of a street the part which lies next to the street, being the most valuable part of the land, is taken for the public use, and what was before in the rear becomes the front part, and upon a wider street, and thereby of greater value than the whole was before, it is neither just in itself, nor required by the constitution, that the owner should be entitled both to receive the full value of the part taken, considered as front land, and to retain the increase in value of the back land, which has been made front land by the same taking.

*Bauman*, 167 U.S. at 574–75, 17 S.Ct. 966.

The *Bauman* decision has led at least one commentator to conclude that "[t]he federal rule regarding setoff of benefits allows benefits to set off ... the value of the property taken." *Nichols, supra,* § 8A.07[1]. Other circuits have reached the same conclusion. *See, e.g., United States v. Trout*, 386 F.2d 216, 221 (5th Cir.1967); *Aaronson v. United States*, 79 F.2d 139, 139–40 (D.C.Cir.1935). Plaintiffs have not asserted that the law is to the contrary. At oral argument plaintiffs agreed that the matter is controlled by federal law and that federal law permits offsetting the value of the part taken by any special benefits conferred.

Plaintiffs point out, however, that it is further the law that only "special" benefits can be deducted from any compensation due; "general" benefits cannot be deduct-

ed. *See City of Van Buren v. United States*, 697 F.2d 1058, 1062 (Fed.Cir.1983); *Trout*, 386 F.2d at 221–22; *Nichols, supra,* § 8A.07[1]. It is the distinction between special and general benefits that plaintiffs offer as the difference between their position and that of the trial court. They assert that any benefit received as a result of the taking is general rather than special, and that therefore setoff is not permitted.

Distinguishing between special and general benefits is not always an easy task. *See Nichols, supra,* § 8A.04[2]. This court has suggested that, as a general matter, special benefits are those which inure specifically to the landowner who suffered the partial taking and are associated with the ownership of the remaining land. *See Van Buren*, 697 F.2d at 1062. In contrast, benefits that inure to the community at large are considered general. *See id.* A similar distinction can be derived from other cases and commentary: special benefits are those which arise directly and proximately to the remaining land as a result of the public work on the part taken, due to the peculiar relation of the land in question to the public work. In contrast, resulting benefits that are more or less common to all lands in the vicinity of the land taken are general. *See United States v. River Rouge Improvement Co.*, 269 U.S. 411, 415–16, 46 S.Ct. 144, 70 L.Ed. 339 (1926); *United States v. 2,477.79 Acres of Land*, 259 F.2d 23, 28 (5th Cir.1958); *United States v. 901.89 Acres of Land*, 436 F.2d 395, 398–99 (6th Cir.1970); *Nichols, supra,* § 8A.04[2].

The Supreme Court's analysis in *River Rouge* of benefits arising by way of a river improvement, which required partial taking of numerous parcels of riparian land, is instructive:

> We are of opinion that an increase in the value of the remaining portion of any parcel of land caused by its frontage on the widened river, carrying a right of immediate access to and use of the improved stream, would constitute a spe-

cial and direct benefit within the meaning of the statute, as distinguished from a benefit common to all the lands in the vicinity, although the remaining portions of other riparian parcels would be similarly benefited.

*River Rouge,* 269 U.S. at 415–16, 46 S.Ct. 144.

In the case before us, the trial court, based on the testimony of the Government's experts, found three types of special benefits arising from the taking of the easements: (1) the investigation, (2) the characterization, and (3) the remediation of the contaminated groundwater. *See Hendler V,* 38 Fed.Cl. at 617, 626–27. The trial court found that, with regard to the "investigation" benefit, it would have been necessary for the plaintiffs to investigate, by way of testing and sampling, the contamination underneath the subject property prior to its commercial development. The trial court noted that both parties' experts explained that property suspected of containing contamination is investigated in two phases when a property owner is preparing a plan of development. Phase One is an assessment of the likelihood of contamination based on available public records and historical data. Phase Two is scientific analysis involving actual testing and sampling. *See Hendler IV,* 36 Fed.Cl. at 587 n. 15. The court further noted that governmental permitting agencies as well as lending institutions would routinely require Phase One/Phase Two investigations for property that might be contaminated. *See Hendler V,* 38 Fed.Cl. at 622.

The court considered that the installation of the wells and attendant testing by the Government provided the necessary information and is the equivalent of a completed Phase Two investigation. The court found that a private undertaking of the investigation would have cost at least $100,000 (with interest, $195,000). *See id.; Hendler IV,* 36 Fed.Cl. at 587 & n. 15.

With regard to the "characterization" benefit, the trial court found that the Government, by way of its activities on plaintiffs' land, characterized the nature and extent of the contamination, thereby eliminating uncertainty as to the land and as a result restoring its otherwise depressed value due to uncertainty. *See Hendler V,* 38 Fed. Cl. at 617, 626–27. Similarly, the court found that the Government's remediation of the contamination in conjunction with the activities on plaintiffs' land conferred a "remediation" benefit to plaintiffs. *See id.*

The Government's expert valued the characterization benefit at $280,000 and the remediation benefit at $244,000. *See id.* at 626. The trial court appears to have credited the Government's characterization and remediation valuations, but it did not expressly find them to be correct. *See id.* at 626–27. Rather, the court stated that even if it "limits the special benefits to the $100,000 cost avoided for a required Phase Two study, the special benefits would outweigh any damage from the physical taking. Therefore, no compensation is due to plaintiffs for the physical taking." *Id.* at 627. In particular, the court noted that even if plaintiffs' valuation of the easements is adopted (with interest, $185,000), the investigation benefit (with interest, $195,000) outweighs the value of the easements. *See id.* at 622, 626–27.

Plaintiffs do not challenge the valuation of this benefit. To the contrary, the trial court noted that plaintiffs concurred that privately-undertaken equivalent tests and analyses, as part of a proposed commercial development, would have cost at least $100,000, totaling with interest $195,000. *See Hendler IV,* 36 Fed.Cl. at 587; *Hendler V,* 38 Fed. Cl. at 622. We have no basis for concluding that this finding is clearly erroneous.

Rather, plaintiffs assert that any benefit provided by the investigation is "general," not "special," and is therefore immaterial. They argue that the only properties specially benefited by the Government's actions are the "intended beneficiaries"— those downstream properties whose own-

ers either used, or intended to use, the groundwater. Plaintiffs claimed no use for the groundwater, given the contemplated commercial development of their property. They argue that therefore their property received only general benefits, benefits common to all lands in the vicinity. In this vein, they assert that the Government's investigation merely provided public information available to "[e]very other property in the vicinity[,] . . . [f]or that matter, [to] every citizen of this country." Finally, they assert that if anyone is specially benefited, "it is the State of California and the other parties liable for characterizing and remediating the Stringfellow contamination."

Though the distinction between "special" and "general" benefits is clearer in the abstract than in the application, on the facts of the case the Government has the better argument, and the trial court was not wrong in viewing these particular benefits as "special" with regard to the particular land. As the above discussion bears out, the fact that others benefited from the Government's activities does not make the benefits to plaintiffs' land general. And, that other landowners may have been the "intended beneficiaries" of the Government's actions is similarly inapposite.

What is relevant is the trial court's finding that the Government's investigation on plaintiffs' land avoided an otherwise required Phase Two study for development of the property. *See Hendler V*, 38 Fed. Cl. at 627. Plaintiffs have not shown this finding to be clearly erroneous. In view of the finding, the "investigation" benefit to plaintiffs—*i.e.*, avoidance of a Phase Two study—inured specifically to them and is associated with their ownership of their remaining property. *See Van Buren*, 697 F.2d at 1062. It inures to plaintiffs because of its peculiar relation to their land. While others may have benefited generally from the information provided by the investigation, the benefit to others was not the same. The benefit to others was not in the form of an equivalent of a Phase

Two study of plaintiffs' property. That benefit is unique to plaintiffs' land, obviating an otherwise necessary requirement for developing the land. In sum, we conclude that the trial court did not err in determining that the plaintiffs' remaining property received an "investigation" special benefit.

Furthermore, given the record in this case, we conclude that the trial court did not err in offsetting this special benefit against the value of the easements taken. However harsh by modern day standards the federal offset rule may seem, which allows the Government to escape any payment for private property actually taken for public use, we accept it as the governing rule for purposes of this case. If the rule is to be changed, and to make it more consistent with the rule followed in the states, it is for Congress to make that change.

This court's predecessor, in the *Bartz* case, applied the rule to deny a group of farm owners along the Iowa River compensation for lands repeatedly flooded by a Government dam, on the ground that their remaining land was greatly benefited by the flood and drought control project, such that the benefits far exceeded the value of the land taken. 633 F.2d at 577–78. The court stated that, "if governmental activities inflict slight damage upon land in one respect and actually confer great benefits when measured in the whole, to compensate the landowner further would be to grant him a special bounty." *Id.* at 578 (quoting *United States v. Sponenbarger*, 308 U.S. 256, 266–67, 60 S.Ct. 225, 84 L.Ed. 230 (1939)).

As the quote indicates, the rule takes its force from the underlying equitable principle that the Government's obligation is, to the extent possible following the Government's intrusion, to restore the landowner to the position he was in absent any government action. In a case in which the problem was not created by the Government, and the Government's intrusion was necessary to correct the problem for the

benefit of the general public, it can be argued that it is not inequitable to balance against the harm caused the landowner by the Government's remedial action any special benefits that happen as a result to accrue to the land. Thus, in the flooding cases such as *Bartz*, in which dams are built to control natural flooding, the result, even though it denies recovery for property actually taken, is seen as not being ultimately inequitable.

Applying that principle to the case at hand, if this were a case in which the Government's remedial efforts were shown to be related to Government causes, the setoff rule would be inapplicable. Here, however, there is no indication that the United States Government contributed in a direct way to the creation of the problems at Stringfellow. *See United States v. Stringfellow*, No. CV–83–2501, 1995 WL 450856, at *5–6 (C.D.Cal. Jan.24, 1995) (unreported order) (holding the owners of the Stringfellow site, the State of California, and users of the site liable for costs associated with the site). Plaintiffs seem to concede that, asserting that "it is the State of California and [ ] other parties [that are] liable for ... the Stringfellow contamination."

Accordingly, the only indication we have in this case is that the Government's role as remediator is free of Government responsibility as a causal agent. If that were not the case, the rule of setoff would have no application, because the Government would merely be remediating its own mistakes. Just as the person who causes injury to his neighbor's land cannot be heard to say that the required restoration is a gift, the Government cannot claim that restoring a landowner's land to its natural state by cleaning up a Government-created pollution problem is a "special benefit" for which the landowner can be charged.

Given that that is not the case here, and given the established precedents that govern compensation for a federal taking, the trial court did not err in setting off the value of the easements taken by the found "investigation" special benefit. Because the unchallenged trial court's valuation of that benefit completely offsets even plaintiffs' valuation of the easements taken, we need not address the correctness of the other special benefits found by the trial court. Simply put, because the court did not err in determining that the value, however measured, of the easements taken is outweighed by the special benefits conferred to the remainder, we affirm the denial of compensation for the value of those easements.

## III.

## SEVERANCE DAMAGES

■ Next we consider plaintiffs' contention that the trial court erred in finding that their retained property suffered no severance damage. In cases of a partial physical taking as that here, just compensation under the takings clause of the Constitution includes "not only the market value of that part of the tract appropriated, but the damage to the remainder resulting from that taking, embracing ... injury due to the use to which the part appropriated is to be devoted." *United States v. Grizzard*, 219 U.S. 180, 183, 31 S.Ct. 162, 55 L.Ed. 165 (1911); *see also Hendler III*, 952 F.2d at 1383–84. However, plaintiffs bear the burden of proving severance damages. *See Miller v. United States*, 223 Ct.Cl. 352, 620 F.2d 812, 828 (1980).

■ Plaintiffs' severance damage theory begins with the proposition that the scope of the taking, and thus the extent of the damage to the retained land, is defined by the broad scope of the access order, and not by the actual activities undertaken by the Government. This theory, if accepted, would have opened up a large measure of potential damages to the retained land, since the access order could be read to authorize virtually unlimited governmental activity. The trial court rejected that theory, as do we. As we explain below, the trial court correctly concluded that the economic consequences flowing from the

access order itself did not rise to the level of a regulatory taking. Though plaintiffs devoted considerable effort in their brief to bolstering the theory, and the damages that would flow from it, the conclusion that there was no regulatory taking cuts the ground out from under it. If there is no regulatory taking, what remains is a physical taking of the easements, and the severance damages, if any, caused by the taking of those easements.

Building on their theory, plaintiffs presented through their expert the proposition in essence that the access order and the Government's activities thereunder made their retained property unmarketable, or at least greatly depreciated. This damage, they contend, was caused by the access order and attendant activities significantly interfering with development of their property and creating the false impression that the property was a source of contamination. Plaintiffs' expert valued the alleged severance damage at over one million dollars (with interest, $3.1 million).

The trial court rejected this aspect of plaintiffs' theory. The court found unconvincing their assertion that the access order and associated activities created the false impression that their property was contaminated, thereby decreasing its value. *See Hendler V,* 38 Fed.Cl. at 621. Instead, the court "found that the 'evidence shows that the value of plaintiffs' property was reduced by the contamination [from Stringfellow], rather than by the actions pursuant to the access order.'" *Id.* (quoting *Hendler IV,* 36 Fed. Cl. at 588). The court went on to state that "[i]t defies logic that the monitoring wells, rather than the actual existence of groundwater contamination, would devalue plaintiffs' property." *Id.* at 622. Thus, the trial court's rejection of plaintiffs' "false impression" theory turned on causation, a question of fact. *See Loesch,* 645 F.2d at 913.

With regard to plaintiffs' assertion that the access order and attendant activities inhibited development of their property, the court found that "the easements could be incorporated into any planned development as parking lots or landscaped areas, without any significant loss of building area." *Hendler V,* 38 Fed.Cl. at 622. This finding is not inconsistent with plaintiffs' contemplated use of the property: they maintained that "their property would have been an ideal location for ... commercial development ... [such as] suburban strip-malls and retail centers...." *Hendler IV,* 36 Fed.Cl. at 586–87. In the end, the court found that "the easements and the [access] order did not materially interfere with the subject property's daily use and did not result in severance damages." *Hendler V,* 38 Fed.Cl. at 622.

In challenging these findings, plaintiffs assert that the trial court erred by rejecting the opinion of their expert, and by basing its analysis on the Government's actual activities on their land rather than the scope of activities permitted under the access order. The difficulty with plaintiffs' position on appeal is that they have to overcome the express findings of the trial court. The trial court's findings are supported by the record; though we might as an initial matter have found otherwise, we cannot say that these findings are clearly erroneous. The Government's experts explained that the consequence of the discovery of actual groundwater contamination on plaintiffs' property was to stigmatize the property for any type of development, and thereby reduced its value by eighty percent.[2] *See id.* at 624. They further testified that the well-site and access-corridor easements were not in themselves an impediment to development of the property. *See id.* at 626. On this point, the trial court noted that "[p]laintiffs' expert conceded that the monitoring wells could have been incorporated into a commercial development without significant difficulty."

---

**2.** Here again we note that there is no indication that the Government was a cause of the contamination of plaintiffs' property. If the opposite were true, our conclusion on this point would as well be different.

*Hendler IV*, 36 Fed.Cl. at 588. The Government's experts additionally opined that the Government's activities pursuant to the access order actually restored value to plaintiffs' property by characterizing and remediating the contamination. *See Hendler V*, 38 Fed.Cl. at 626. In view of this evidence, we cannot say that the trial court clearly erred in rejecting the contrary opinion of plaintiffs' expert.

With regard to the access order itself, the court noted that the "order was never invoked to bar any sale or development of plaintiffs' property." *Hendler IV*, 36 Fed. Cl. at 588. In fact, "[p]laintiffs failed to disclose the existence of the [access] order to any of the prospective purchasers, and none of the proposals for purchase of the subject property were made with knowledge of it." *Id.* Furthermore, the court noted that "[p]laintiffs' expert ... admitted that someone interested in developing the property would attempt to find out the nature of the monitoring activities and what accommodations could be made." *Hendler V*, 38 Fed.Cl. at 619. Accordingly, we cannot say that the trial court clearly erred in finding that the access order did not itself result in measurable severance damages.

Again, while we might have reached contrary findings had we sat as the trier of fact, that does not entitle us to reverse the trial court's findings. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). We are limited to the clearly erroneous standard of review, and plaintiffs' have failed to convince us that the findings fail that standard. In view of these findings, we must affirm the judgment with respect to severance damages.

## IV.

### REGULATORY TAKING

■ Lastly, we consider plaintiffs' assertion that the trial court erred in determining that there has been no regulatory taking of their property. In *Hendler I*, the trial court held that the access order, standing alone, did not work a regulatory taking. 11 Cl.Ct. at 96. In *Hendler III*, we concurred, stating that: "On the facts then before the court ... we do not disagree with that ruling." 952 F.2d at 1375. We went on to note that "subsequent events, in light of the character of the Government's action and plaintiffs' distinct investment-backed expectations, might have had sufficient economic impact on the plaintiffs to constitute a regulatory taking." *Id.* We remanded for "the fact-specific findings required for determining" whether a regulatory taking has occurred. *Id.* at 1375, 1384. That is what the trial court set out to do, *see Hendler IV*, 36 Fed.Cl. at 585–89, but plaintiffs claim that it erred.

■ A pivotal criterion governing whether a regulatory taking has occurred is the impact the regulatory imposition has had on the economic use, and hence value, of the property. *See Florida Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1564–65 (Fed.Cir.1994); *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1179 (Fed. Cir.1994). If a regulation categorically prohibits all economically beneficial use of land there is, without more, a compensable taking. *See Florida Rock*, 18 F.3d at 1564–65. On the other hand, though it is not necessary to have a total wipeout before the Constitution compels compensation, if the regulatory action is not shown to have had a negative economic impact on the property, there is no regulatory taking. *See generally id.* at 1569–71; *Loveladies*, 28 F.3d at 1180. The question of the economic impact of a particular regulatory action is of course fact-specific to the case. *See Florida Rock*, 18 F.3d at 1570.

Plaintiffs' economic impact theory for their regulatory taking claim is quite similar to their severance damage theory. They contend that the access order and attendant activities falsely stigmatized their property as a source of contamination, and significantly interfered with its development. As a result, they contend,

the property was unmarketable for a period of up to twelve years, yielding a loss in the range of $16–18 million.

The trial court's rejection of this claimed economic impact parallels its analysis and findings with respect to plaintiffs' severance damage claim. The court found that their property was stigmatized by the actual contamination from Stringfellow, rather than the Government's actions pursuant to the access order. *See Hendler IV,* 36 Fed.Cl. at 588. Furthermore, the court found that the access order and Government actions thereunder did not interfere with the development or marketing of the property. *See id.*

We have already concluded (with respect to the question of severance damages) that these factual findings by the trial court are not clearly erroneous, and thus cannot be disturbed. In light of these findings, we cannot say that the court erred in determining that plaintiffs have not suffered a regulatory taking. In sum, as found by the trial court, plaintiffs failed to prove that their "use" was sufficiently interfered with to constitute a regulatory taking. *See Florida Rock,* 18 F.3d at 1568–71.

The trial court alternatively based its rejection of plaintiffs' regulatory taking claim on the theory that "the nuisance exception described in *Loveladies, Lucas* [*v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)] , and other cases" is applicable and defeats the claim. *Hendler IV,* 36 Fed. Cl. at 585–86. However, having concluded that the trial court did not err in determining that there was insufficient economic impact to give rise to a regulatory taking, it is unnecessary for us to consider this further theory; under the circumstances, we choose not to. Thus, while in appropriate cases the nuisance doctrine is an available defense (*see Florida Rock,* 18 F.3d at 1565 n. 10; *Loveladies,* 28 F.3d at 1182–83), we do not decide whether it has any applicability to this case.

## CONCLUSION

The judgment of the Court of Federal Claims is

### *AFFIRMED.*

### COSTS

The parties shall bear their own costs.