# United States Court of Appeals
# for the Federal Circuit

---

**TROY ALFORD, KATHY ALFORD, HAROLD ANGELO, LUCY BARWICK, THOMAS BEASLEY, SANDRA BEASLEY, LARRY BLACKWELL, JOHN BRINKMAN, ANGELA BRITT, STEPHANIE COOK, JAMES COX, JOHN FEMINELLA, CHARLES FRANKLIN, GERALD GELSTON, JACK GOODSON, CHRIS HAMMACK, GUS HARRISON, CLAUDE HUDSON, SHERMAN HULL, OLLIE HULL, LAMARR JOSEPH, WILLIAM KITCHENS, KEN KLAUS, KIM KOPPMAN, GLENN LECOMPTE, FAYE LITTLE, JAMES LUKE, PATTY MCKAY, GEORGE MCMILLIN, WILLIAM MCRIGHT, CHARLES MULLINS, BILLY NICHOLS, RAYMOND PALMER, SANDRA PALMER, LOU PARKER, DONALD REDDEN, DOROTHY REDDEN, ALBERT ROBERSON, JOHNNY ROLAND, KEITH RUSHING, GEORGE SILLS, HUEL SILLS, RONALD WILSON, EAGLE LAKE VIEW, LLC, JOHN AND JANE DOES 1-100, M. JAMES CHANEY, JR.,**
*Plaintiffs-Appellees*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

---

2019-1678

---

Appeal from the United States Court of Federal Claims in Nos. 1:14-cv-00304-LAS, 1:14-cv-01120-LAS, Senior Judge Loren A. Smith.

————————————

Decided: June 19, 2020

————————————

SHELDON G. ALSTON, Brunini, Grantham, Grower & Hewes, PLLC, Jackson, MS, argued for plaintiffs-appellees Troy Alford, Kathy Alford, Harold Angelo, Lucy Barwick, Thomas Beasley, Sandra Beasley, Larry Blackwell, John Brinkman, Angela Britt, Stephanie Cook, James Cox, John Feminella, Charles Franklin, Gerald Gelston, Jack Goodson, Chris Hammack, Gus Harrison, Claude Hudson, Sherman Hull, Ollie Hull, Lamarr Joseph, William Kitchens, Ken Klaus, Kim Koppman, Glenn Lecompte, Faye Little, James Luke, Patty McKay, George McMillin, William McRight, Charles Mullins, Billy Nichols, Raymond Palmer, Sandra Palmer, Lou Parker, Donald Redden, Dorothy Redden, Albert Roberson, Johnny Roland, Keith Rushing, George Sills, Huel Sills, Ronald Wilson, Eagle Lake View, LLC, John and Jane Does 1-100. Also represented by ROBERT LANE BOBO, ROBERT RICHARD CIRILLI, JR.; SCOTT H. ANGSTREICH, JACOB HARTMAN, DANIEL SEVERSON, Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C., Washington, DC.

BARRETT BLAKE TELLER, Teller, Hassell & Hopson, LLP, Vicksburg, MS, for plaintiff-appellee M. James Chaney, Jr.

JOHN EMAD ARBAB, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, argued for defendant-appellant. Also represented by ERIKA KRANZ, JEFFREY B. CLARK, ERIC GRANT.

————————————

Before DYK, SCHALL, and O'MALLEY, *Circuit Judges.*

DYK, *Circuit Judge.*

The plaintiffs, appellees in this court, own properties surrounding Eagle Lake in Mississippi. In 2011, the Army Corps of Engineers ("Corps") raised the water level of Eagle Lake to prevent a nearby levee from breaching. The plaintiffs' properties were damaged as a result of the water level increase, but the damages sustained were less than the damages to the plaintiffs' properties that would have resulted from a levee breach. The plaintiffs sued the government in the United States Court of Federal Claims ("Claims Court"). The Claims Court found that the government was liable and awarded the plaintiffs $168,000 in compensatory damages. The government appeals. We reverse the Claims Court's judgment because the relative benefits doctrine bars liability.

## BACKGROUND

Eagle Lake is an oxbow lake near Vicksburg, Mississippi. The water levels in the lake are controlled by the Muddy Bayou Control Structure ("the Control Structure"), which is a component of the Corps' Mississippi River flood control program (the "Mississippi River and Tributaries Project"). The operation of the Control Structure in normal conditions resulted in predictable water levels in Eagle Lake. The plaintiffs own various properties that surround the lake. The predictable water levels of Eagle Lake allowed them to build structures such as piers, boat houses, and docks on the lakeshore.

In 2010, the Corps determined that the presence of "sand boils"—voids in the sand that form due to pressurized or fast-flowing water migrating through the land-facing side of a levee—threatened the stability of the nearby Mississippi River Mainline Levee, a component of the same flood-control program as the Control Structure.

Unusually wet weather in 2011 exacerbated this issue. On April 25, 2011, the Corps declared an emergency. The Corps determined that the rise in nearby water levels was threatening the structural integrity of the levee and "projected that the likelihood of breach was over 95%." J.A. 2. The Corps decided to flood Eagle Lake above 90 feet to reduce water pressures along the levee. The government knew that the increased water levels would cause damage to the plaintiffs' properties. *Id.* ("A decision was made to raise the [water level of Eagle] Lake, knowing plaintiffs' properties would be damaged."). As a result of that action, which the plaintiffs characterize as "buil[ding] a water berm," Appellee's Br. 38, the levee did not breach. The water level remained elevated for three months. Thereafter, the government built a permanent berm to reinforce the levee.

A breach of the levee would have resulted in widespread flooding affecting "about a million acres and possibly between four thousand to six thousand homes and businesses." J.A. 2. The flooding would have damaged and adversely affected the plaintiffs' properties. According to an expert report submitted by the government, the "hypothetical water levels" would have resulted in such extensive damage to the plaintiffs' properties that, to repair each property, "the main residence must be gutted and demolished back to the original wood stick framing." J.A. 2846. The damage to the plaintiffs' properties from a levee breach would have exceeded the damage caused by raising the lake water levels.

The plaintiffs sued the government in the Claims Court, seeking compensation for their damaged properties under the theory that the raising of the water level of Eagle Lake was a government taking. The government raised four defenses. First, it asserted that the plaintiffs were not entitled to damages under the relative benefits doctrine. The government's argument was that the plaintiffs were better off as a result of the Corps' actions. If the

government had not raised the water level of Eagle Lake, the levee would almost certainly have breached, and the plaintiffs would have suffered more damages to the same properties.  Second, the government asserted that plaintiffs failed to prove causation under *St. Bernard Parish Government v. United States*, 887 F.3d 1354, 1362 (Fed. Cir. 2018), because the plaintiffs had failed to establish what would have happened if the government had not acted at all.  Third, the government argued that the doctrine of necessity precluded government liability because the risk of a breach presented an "imminent danger and an actual emergency."  J.A. 72 (quoting *TrinCo Inv. Co. v. United States*, 722 F.3d 1375, 1378 (Fed. Cir. 2013)).  Finally, the government argued that the plaintiffs failed to show that a taking had occurred under the multi-factor test for government-induced floods articulated in *Arkansas Game & Fish Commission v. United States*, 568 U.S. 23 (2012).

The Claims Court rejected the government's arguments, holding that it was "clear in this case that the government knowingly took action that destroyed some of the plaintiffs' property."  J.A. 2.  With respect to the relative benefits doctrine, the Claims Court acknowledged that it was "certainly true that [the levee and Control Structure] benefitted the plaintiffs," and that "in the hypothetical world where the breach [of the levee] occurred, the plaintiffs would have been far worse off."  J.A. 3.  Despite these facts, the Claims Court held that the "hypothetical situation" of a levee breach was irrelevant to the issue of liability.  *Id.*  The Claims Court awarded the plaintiffs $168,000 in damages for the diminution in the fair market value of their properties but denied certain plaintiffs' requests for consequential (lost profits and loss of use and enjoyment) damages.

The government appeals, and we have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

We review the Claims Court's legal conclusions de novo and its factual findings for clear error. *Hendler v. United States*, 175 F.3d 1374, 1378–79 (Fed. Cir. 1999).

We need not reach the government's arguments concerning causation, the doctrine of necessity, or application of the *Arkansas Game & Fish* standard because we conclude that the relative benefits doctrine forecloses liability. That doctrine is closely related to, but distinct from, the issue of causation.

The relative benefits doctrine was first articulated by the Supreme Court in *United States v. Sponenbarger*, 308 U.S. 256 (1939), which involved the same flood control program at issue in this case. In *Sponenbarger*, the plaintiff alleged that the government's construction plan for a floodway involved an "intentional, additional, occasional flooding, [that] damag[ed] and destroy[ed]" the plaintiff's land. *Id.* at 260. The Court first noted that the 1928 Act that authorized the Mississippi River and Tributaries Project "accepted the conception . . . that levees alone would not protect the [Mississippi] valley from floods." *Id.* at 261. The construction of floodways was therefore necessary to "limit to predetermined points . . . escapes of floodwaters from the main channel." *Id.* at 262.

The Court noted that the district court had found that the floodway in question had "always been a natural floodway," *id.* at 262–63, and held that no taking had occurred because "[t]he Government ha[d] not subjected [the plaintiff]'s land to any additional flooding, above what would occur if the Government had not acted," *id.* at 266. "[T]he Fifth Amendment does not make the Government an insurer that the evil of floods be stamped out universally before the evil can be attacked at all." *Id.* "Enforcement of a broad flood control program does not involve a taking merely because it will result in an increase in the volume or velocity of otherwise inevitably destructive floods, where

the program measured in its entirety greatly reduces the general flood hazards, and actually is highly beneficial to a particular tract of land." *Id.*

Our predecessor court, the Court of Claims, applied the rule announced in *Sponenbarger* in *Ark-Mo Farms, Inc. v. United States*, 530 F.2d 1384 (Ct. Cl. 1976), to reject a plaintiff's takings claim when the evidence showed "that the [government] project had in fact decreased peaks, duration and frequency of floods at the [plaintiff's property]." *Id.* at 1386. Again in *Accardi v. United States*, 599 F.2d 423 (Ct. Cl. 1979), the Court of Claims reiterated this principle, concluding that when the "plaintiffs have wholly failed to show that [the government]'s construction or operation of [an irrigation project] subjected their lands to any additional flooding above what would have [otherwise] occurred," "there has been no taking of [the] plaintiffs' property." *Id.* at 429–30; *see also Bartz v. United States*, 633 F.2d 571, 578 (Ct. Cl. 1980).

In *Hendler*, our court explained that the relative benefits doctrine "takes its force from the underlying equitable principle that the Government's obligation is, to the extent possible following the Government's intrusion, to restore the landowner to the position he was in absent any government action." *Hendler*, 175 F.3d at 1382. "[I]n the flooding cases such as *Bartz*, in which dams are built to control natural flooding, the result, even though it denies recovery for property actually taken, is seen as not being ultimately inequitable." *Id.* at 1383.

The cases discussing the relative benefits doctrine examine the overall benefits of the government action with respect to the particular property as compared to the detriment that was suffered. *See Sponenbarger*, 308 U.S. at 266 (considering the "benefits [of the governmental activities] when measured in the whole"); *Accardi*, 599 F.2d at 429–30 (considering the benefit to the plaintiffs' land by comparing the existence of a government project, a river

division, to "what would have occurred in consequence of the severe . . . storm [event at issue] had [the government] not constructed the division at all"); *Hendler*, 175 F.3d at 1381–82 (considering the government's "investigat[ion], by way of testing and sampling, [groundwater] contamination," was a benefit "inure[d] to [the] plaintiffs because of its peculiar relation to their land," and that the trial court could "offset[] this . . . benefit against the value of the easements [that the government had allegedly] taken" when carrying out the project).[1]

In this case the parties have taken a narrower view, focusing not on the overall benefits of the government project on the plaintiffs' properties, but on only the benefits to the plaintiffs' properties from the government's 2011 decision to raise the water level of Eagle Lake. Even assuming that this narrow focus was correct, the plaintiffs make no claim that they would have been better off if the government had allowed the levee to breach. The government's uncontested evidence showed that, in the event of a breach of the levee, the water level of Eagle Lake would have far exceeded that caused by the Corps' intentional flooding. Each of the plaintiffs suffered considerably less damage due to the government's planned flooding of Eagle Lake

---

[1]    The cases make clear that our inquiry must be focused on the particular property owned by the plaintiffs and claimed to have been damaged. *See Sponenbarger*, 308 U.S. at 266 (focusing its inquiry on the benefits to the "particular tract of land" at issue); *Accardi*, 599 F.2d at 429–30 (focusing its relative benefits analysis on the "plaintiffs' real properties"); *Hendler*, 175 F.3d at 1382–83 (explaining that the relative benefits doctrine balances "the harm caused [to] the landowner by the Government's . . . action [with] any special benefits that happen as a result to accrue to the [landowner's] land").

than if the levee had breached.[2] The Claims Court expressly found that the plaintiffs had directly benefitted from the government's action. The Claims Court found that it was "certainly true" that the flood protection offered by the levee and Control Structure "benefitted the plaintiffs." J.A. 3. Absent government intervention, "the likelihood of [a] breach [of the levee] was over 95%." J.A. 2. "If the levee had broken," the "[p]laintiffs' propert[ies] would have been totally inundated" and would have "suffered more serious damage than they actually did." J.A. 3. "[T]he plaintiffs would have been far worse off . . . ." *Id.* Under the Claims Court's findings, the benefit of the government action, with respect to preventing a breach of the levee, outweighed the damage caused by the government's flooding of Eagle Lake.

The Claims Court, however, refused to apply the relative benefits doctrine, reasoning that it was inappropriate to "apply[] a hypothetical situation to discount the harm plaintiffs suffered in the real world." *Id.* There is no basis for refusing to consider "the hypothetical world where the breach [of the levee] occurred." *Id.* Courts applying the relative benefits doctrine have consistently considered what would have occurred absent government action. *See,*

---

[2]     The Claims Court awarded Mr. MacNealy, whose property suffered the most damage, $79,000 for diminution in the fair market value of his property based on the testimony of the government's expert, Mr. Parker. The record shows that Mr. MacNealy's damages would have been $147,000 if the levee had breached. Trial Transcript at 1582, 1594, *Alford v. United States*, 141 Fed. Cl. 421 (2019) (No. 1:14-cv-003040-LAS), ECF No. 83. The other plaintiffs would have been even worse off. For example, the Chaney property would have suffered a $208,000 loss if the levee had breached, as opposed to the $25,000 in damages due to the government's action. *Id.* at 1560.

*e.g., Sponenbarger,* 308 U.S. at 266 ("The Government has not subjected respondent's land to any additional flooding, above what would occur if the Government had not acted . . . ."); *Accardi,* 599 F.2d at 429–30 (noting that the plaintiffs had failed to compare the government's action to "what would have occurred . . . had [the government] not [acted] . . . at all"); *Hendler,* 175 F.3d at 1382 (noting that the relative benefits doctrine "takes its force from the . . . equitable principle that the Government's obligation is . . . to restore the landowner to the position he was in absent any government action"). Nor is the relative benefits doctrine rendered inapplicable because the government's action was intentional, and the government was aware that its actions would have damaged the plaintiffs' properties. *Sponenbarger,* 308 U.S. at 260 (finding no taking even though the plaintiff had alleged that the government's construction plan involved an "intentional . . . flooding" of her land). The Claims Court erred by failing to consider what would have happened if the government had allowed the levee to breach.

The Claims Court found it significant that the benefits to the general public were substantial. The relative benefits doctrine does not compare the benefits conferred on the community at large to the damage suffered by the plaintiffs. While the purpose of the Takings Clause is "grounded upon a conception of the injustice in favoring the public as against an individual property owner," *Id.* at 266, the relative benefits doctrine requires determining whether the burden on the plaintiffs' property is outweighed by the benefits conferred on that property. The benefit to the community at large has nothing to do with the relative benefits comparison.

The Claims Court also suggested that it would not consider the benefits of the levee and Control Structure because, "[i]f the benefits citizens get from the federal government are to be put on the scale in a taking case, the citizen would always lose" because "[g]overnment

programs benefit all citizens in various ways." J.A. 3. There is no suggestion that all government benefits must be considered under the relative benefits doctrine. The relative benefits doctrine considers only government actions directed to the particular property at issue and considers only government activities directed to mitigating the type of problem that caused the damage. *See Sponenbarger*, 308 U.S. at 265–66 (explaining that the government had not subjected the plaintiff's land to "additional flooding" and "the same floods and the same damages would occur had the Government undertaken no work of any kind"). The levee and Control Structure are directed to the same type of flooding injury that the plaintiffs in this case suffered. The general benefits of having a federal government, such as the "military keep[ing] the region from being overrun by foreign governments," J.A. 3, are not the types of benefits relevant to the relative benefits analysis in the flood control context.

Under the circumstances here, the relative benefits doctrine compels a conclusion that there was no liability: the plaintiffs' properties would have been "far worse off" and "suffered more serious damage" if the government had not acted. *Id.* We need not reach the government's remaining arguments. The judgment of the Claims Court is reversed.

**REVERSED**